**Thomas and Carol O'LEARY, et al.,**

**Commonwealth Department of Environmental Resources**

v.

**MOYER'S LANDFILL, INC., et al.**

**Civ. A. No. 80–3849.**

United States District Court,
E. D. Pennsylvania.

Aug. 27, 1981.

Joseph M. Donley, Robert Hernan, Philadelphia, Pa., for private plaintiffs.

John R. Embick, Asst. Gen. Counsel, Commonwealth of Pa., Dept. of Environmental Resources, Kenneth A. Gelburd, Philadelphia, Pa., for the Com.

Bradford F. Whitman, Jonathan L. Braff, Philadelphia, Pa., for defendants.

## OPINION

LOUIS H. POLLAK, District Judge.

### I.

The Pennsylvania Department of Environmental Resources (DER) brought suit against Moyer's Landfill, Inc., Howard Moyer, Jr., Paul Lanigan, Catherine Moyer and Grange Environmental, Inc., in the Commonwealth Court of Pennsylvania. DER's papers contained a complaint in equity, petition to enforce administrative order, petition for contempt, and a petition for preliminary injunction. No. 1651 C.D. 1981. These actions were brought while I was considering proposals for final relief in Civil Action No. 80–3849, a related suit by citizen plaintiffs against the landfill and Messrs. Moyer and Lanigan. I approved a stipulation between attorneys for DER, the private plaintiffs, and all defendants, transferring the state case to this court, in an attempt to secure a coordinated resolution of related claims against the defendants.

Stipulation and Order of July 10, 1981.[1] Because, but for the stipulation transferring DER's case to this court, DER's motion for a preliminary injunction would have been heard by the Commonwealth Court, I regarded myself, in considering the motion, as cloaked with the duty and authority of the Commonwealth Court[2] (subject of course to any pertinent limitations imposed on federal courts by Article III of the Constitution).

On July 17 and 24, 1981, a hearing was held on the first phase of DER's prayer for a preliminary injunction, in which DER sought to embody the substance of its June 26, 1981 order in a judicial decree. DER's June 26 order directed the defendants (1) to remove up to 50,000 gallons per day of leachate from the landfill site in order to reduce the volume of a recently accumulating leachate "lake," and (2) to insure that the leachate not discharge past the containing earthen berms, and to take certain other steps to collect and contain and/or dispose of leachate. The text of those substantive portions of its June 26 order which DER wants converted into a judicial decree is as follows:

. . . .

It is hereby ordered that:

1.  Effective immediately, and until further notice, Landfill, Owners and Operators shall remove and haul daily to disposal locations approved by DER, an amount of leachate which is equivalent to the daily volume of leachate generated by the landfill and collected in the leachate collection basins and sumps which comprise the Landfill's existing and approved leachate collection system. In no event, however, shall the volume of leachate removed and hauled in any day be less than 50,000 gallons. If the volume of leachate collected in the collection system for any given day is less than 50,000 gallons, Landfill, Operators and Landowners shall remove and haul from the leachate lake a volume of leachate sufficient to raise the total volume of leachate removed and hauled for that day to 50,000 gallons. Landfill, Operators and Landowners shall, until further notice, report to DER on a daily basis, the amounts of leachate hauled from the site and indicate the disposal location.

2.  Effective immediately and until further written notice from DER, Landfill, Operators and Landowners shall spray irrigate from spray nozzles such volumes of leachate from the leachate lake not exceeding ½″ per acre per day onto the portion of the landfill designated as Area "D" on the Final Closure Plan Map dated April 22, 1981. Such spray irrigation shall be conducted only during sunny weather and shall be conducted in such a manner as to prevent ponding runoff or erosion on the landfill site.

3.  Effective immediately Landfill, Operators and Landowners shall prepare the aboveground storage or holding tanks currently located on the site adjacent to the landfill office for the water-tight storage of leachate from the landfill. In addition Landfill, Operators and Landowners shall provide such equipment as is necessary to pump leachate from the leachate collection system and/or leachate lake into the said stor-

---

1.  All parties to the transferred case also agreed to be bound by the record already developed in Civil Action No. 80–3849.

2.  DER brought this action under the Solid Waste Management Act, 35 P.S. § 6018.101 *et seq.*, and the Clean Streams Law, 35 P.S. § 691.1 *et seq.* The statutory schemes allow DER to issue administrative orders, §§ 6018.-602; 691.610, effective upon notice, *id.* See also 71 P.S. § 510–17 (order to abate nuisances). Failure to comply with the orders is prohibited, §§ 6018.601; 691.610. The role of the Commonwealth Court is provided for at: § 6108.603, authorizing the court to hold in contempt parties not complying with the agency's orders; § 6018.604, allowing equity suits to enjoin violations of the statute and agency orders; §§ 691.601 and 691.503, declaring a violation of an agency order to be a "public nuisance" abatable by the agency, and authorizing suits to enjoin violations of the orders. 42 Pa.C.S.A. § 761(a)(2) vests the Commonwealth Court generally with jurisdiction to hear cases brought by the Commonwealth.

age or holding tanks. No leachate shall be stored in said storage tanks without prior written approval from DER.

4. Effective immediately Landfill, Operators and Landowners shall cease the uncontrolled discharge of leachate through the breakouts at the leachate lake and shall take all necessary actions to prevent further discharge including but not limited to the following:

a. Provide at least 24" of freeboard for the leachate lake;

b. Repair the side berms of the leachate lake so as to prevent the further discharge or breakout of leachate through the berms.

5. Effective immediately Landfill, Operators and Landowners shall take all necessary additional measures, upon receiving prior written approval from DER, to prevent further collection or impoundment of leachate in the leachate lake.

. . . .

## II.

The evidence before me established that at the end of May or the beginning of June, 1981, a "lake"—more properly, a pond—of leachate formed on the surface of the landfill. It was approximately 100 by 100 feet, and its depth over the ensuing weeks varied between two and three feet. The sides of the pond were porous earthen berms, through which leachate could, and did, seep, sometimes escaping the landfill altogether. The leaking berms were on the north and west sides of the pond; on at least one occasion, leachate was seen leaving the site to the south.[3] DER believes the pond resulted from poor grading of the area, and the defendants' failure to haul sufficient leachate off-site.

3. As my Opinion of June 9, 1981 notes, streams leading to the Skippack Creek lie directly downhill to the south and northwest of the site. *O'Leary v. Moyer's Landfill, Inc.,* 523 F.Supp. 642.

4. The parties stipulated to figures for the period April 1, 1981, through July 10, 1981.

As DER has argued, without serious opposition, the existence of this leachate pond poses a serious threat to the local environment: Should the seepage continue, or the berms give way, large amounts—some 250,000 to 500,000 gallons—of leachate will course down the swales towards the nearby streams.

During July, DER agents made numerous visits to the landfill and observed on July 13 and 16 an attempt to contain the pond's threat: The pond had been separated by a berm into two parts, and the northern part was being filled in with dirt. Over those three days, the pond's dimensions were somewhat reduced by this technique, but the berms on the northern side continued to seep, and on July 23, 1981, one agency representative reported the leachate was "still flowing over the north and the west sides of the Landfill." Freeboard—the vertical distance between the leachate surface and the top of the adjacent berm—on July 23 was measured at twelve inches, half of that required by DER's June 26 order. Defendants never hauled 50,000 gallons of leachate a day from the landfill as required: the mean appears to have been 18,000 gallons, and no daily haul exceeded 30,000 gallons.[4]

There is, therefore, no doubt that defendants have not complied with DER's June 26 order.

## III.

Defendants have pointed to their alleged financial incapacity in an attempt to resist the issuance of a preliminary injunction. Two arguments have emerged from the description of the landfill's economic plight, neither of which I hold to be a relevant defense to this proceeding.[5]

5. Defendants' evidence in this respect was very weak indeed: an apparently incomplete and uncertified financial statement of the corporate defendant, Moyer's, was proffered; virtually nothing was heard on the assets of the individual defendants and Grange Environmental. With such a record, I would not refuse to issue DER's requested order even if financial inca-

First, defendants ask me to find the DER order invalid, as unreasonable and capricious. This follows, defendants assert, from an April, 1981 DER closure order which effectively halted landfill revenues and caused essential equipment to be repossessed, thereby preventing defendants from taking effective measures to contain the leachate on top of the landfill before it aggregated into a "lake." Thus, defendants contend, the pond is a result, "at least in large part" of DER's actions, and, therefore, the June 26 order is invalid. But the contention is without merit: A Pennsylvania landfill operates only on Commonwealth sufferance, as embodied in the license issued by DER. A landfill operator not fulfilling DER's requirements is not privileged to bargain with the agency, demanding that the landfill be kept open—regardless of past and potential future violations—in return for performing mandated remedial measures. DER and the Commonwealth for which it acts are entitled to enforcement of the whole law.

Second, defendants have asserted that their present shortage of funds is a general and absolute defense to DER's petition for a preliminary injunction.[6] Here again, defendants' contention is wide of the mark: While it is true that completely "unenforceable" decrees should not issue,[7] matters relating to defendants' good faith efforts to comply with court orders are generally considered in the context of contempt proceedings. *Cf.* Wright & Miller, *supra* n. 6 at 586.

Because DER's June 26 order is—both on its face and as the evidence developed before me—a reasonable directive not patent-ly impossible to comply with, it cannot be shunted aside as an "unenforceable" decree.

While the foregoing would dispose of the defendants' proffered defense to DER's petition in a standard federal case, defendants also invoke case law at first blush peculiar to Commonwealth enforcement proceedings—case law which, it is asserted, explicitly permits the court to consider the financial capability of defendants to comply with the proposed order.

Under Pennsylvania practice, a DER order may be challenged via an appeal to the Environmental Hearing Board, and thence to the Commonwealth Court and the Pennsylvania Supreme Court. In cases coming to the courts from orders of the Environmental Hearing Board affirming DER orders, it has been held that a defense of financial incapacity to comply is unavailable for the reason that the proceeding is not one to "enforce" a DER order. *Ramey Borough v. Commonwealth Department of Environmental Resources,* 466 Pa. 45, 351 A.2d 613, 615 (1976); *see also Kidder Township v. Commonwealth Department of Environmental Resources,* 41 Pa.Cmwlth. 376, 399 A.2d 799, 801 (1979). From these pronouncements, defendants undertake to derive the obverse proposition that, where DER takes the initiative to seek a judicial remedy (from the Commonwealth Court, or, in this unusual instance, this court as the Commonwealth Court's surrogate), the suit is an "enforcement" proceeding in which financial incapacity to comply is a proper defense.

On a verbal level, the argument has a certain plausible symmetry. But I draw from the cases a different line of demarca-

---

pacity were a defense in the present proceeding.

**6.** This is to be distinguished from the common position taken by respondents in such proceedings that the balance of equities tips in favor of the respondent-defendants, for the standard considerations before a court on application for a preliminary injunction are: (1) the probability of plaintiff's success on the merits, (2) irreparable harm to plaintiff during the pendency of the litigation should the injunction be denied, (3) balancing the hardships on the defendants if the injunction issues, and (4) the impact of the

injunction on more general societal interests. O. Fiss, *Injunctions* (1972) at 168; 11 Wright & Miller, *Federal Practice and Procedure* § 2948 at 430–31.

**7.** *Developments in the Law—Injunctions,* 78 Harv.L.Rev. 994, 1012 (1965); *but cf. Centennial School District v. Commonwealth Department of Education,* 47 Pa.Cmwlth. 428, 408 A.2d 211, 216 (1979) (matter of discretion to issue mandamus where respondent has no funds with which to comply).

tion—that which separates a proceeding, such as this one, to translate a DER order into a court order, from a proceeding to impose penalties for violation of a DER-or-court order. The distinction is illustrated by the Commonwealth Court's decision in *Commonwealth v. Borough of Reynoldsville*, 39 Pa.Cmwlth. 318, 395 A.2d 333 (1978) (*per curiam*). There DER had ordered the Reynoldsville Sewage Authority to upgrade its sewage treatment system. The Authority did not appeal from the order and indeed voted to take steps to implement the order; but the Borough Council of Reynoldsville vetoed the Authority's decision. In the face of the Borough's frustration of DER's directive to the Authority, DER sought from the Commonwealth Court an injunction directing the Authority and the Borough to proceed with the upgrading measures theretofore required of the Authority by DER. Judge Blatt, sitting as Chancellor, rejected the Borough's defense of financial incapacity. She held, in conclusion of law number 8:

> The financial status of the Borough is not a defense to the instant action but can be raised in a contempt proceeding to enforce an order of this Court.

395 A.2d at 335.

The Commonwealth Court, *per curiam*, affirmed Judge Blatt's ruling:

> We believe the Borough's exception to conclusion number 8 to be likewise without merit because its financial ability to comply with the order is not relevant here where the purpose of the DER is to establish a legal duty. As our Supreme Court has explained:
>
> > "The ability of a municipality to comply with a DER order, for technological or economic reasons, may be relevant in a proceeding *to enforce* a DER order. This is not such an action however. The appeal from the issuance of the order serves only to determine the validity and content of the order. . . .

> "If, at some future date, the Commonwealth seeks *to enforce* such an order by mandamus, contempt or other action, courts would then be required to examine the municipality's ability to comply with the order." *Ramey Borough v. Department of Environmental Resources*, 466 Pa. 45, 49, 351 A.2d 613, 615 (1976) (emphasis added) (footnote omitted). *See Commonwealth ex rel. Alessandroni v. Confluence Borough*, 427 Pa. 540, 234 A.2d 852 (1967).

> Although the Supreme Court was dealing there with an appeal of a DER order, we think that its reasoning is equally applicable in this equity action. The crucial test in either event is whether or not the proceeding is one for enforcement, and we believe that this proceeding is not. The Borough was not a party to the DER's order, and the DER is here attempting to establish the Borough's obligation to cooperate with the Authority in complying with the DER's order. The financial status of the Borough is not relevant to the determination as to its duty to cooperate.

395 A.2d at 335–36.

█ DER's instant motion for a preliminary injunction is, like DER's application for injunctive relief in *Reynoldsville*, intended "to establish a legal duty," as is contemplated by 35 P.S. § 6018.604 and 35 P.S. § 691.601 and § 691.503. It is not a proceeding sounding in contempt. 35 P.S. § 6018.603. When only the "merits of [DER's] order" are before the court, *Kidder Township, supra*, 399 A.2d at 801, financial incapacity is not a defense.[8]

## IV.

Accordingly, in an accompanying Order, there is entered a preliminary injunction requiring defendants to comply with DER's order of June 26, 1981.[9]

---

8. Unlike *Reynoldsville*, all the defendants in this court were covered by the agency order; but this distinction is not germane to the Commonwealth Court's analysis of the "enforcement"—"merits" dichotomy.

9. Against the possibility that I might conclude that entry of a preliminary injunction is warranted, defendants have asked that I include in any such directive an order permitting the land-

fill to reopen operations in the southerly portion of the site, an area in which filling was at one time permitted by DER. This, it is asserted, would provide the funds necessary to comply with the order. DER, however, not only disagrees with defendants' estimate of expected revenues from such operations, but has previously determined that additional ground water information is required before filling should be permitted to resume in the southerly area. That determination does not appear to be unreasonable, and accordingly, I will not disturb it. Further, a January 29, 1981, DER order confines future solid waste disposal to the lined area of the site, which does not include the southerly portion. The January order has not been appealed to the Environmental Hearing Board, and the time in which to file an appeal has expired. See 71 P.S. § 510.21. Accordingly, the validity of that order cannot be reviewed. *Commonwealth Department of Environmental Resources v. Williams*, —— Pa. Cmwlth. ——, 425 A.2d 871, 872 (1981).