**Thomas and Carol O'LEARY, et al.**

v.

**MOYER'S LANDFILL, INC., et al.**

**Civ. A. No. 80–3849.**

United States District Court,
E.D. Pennsylvania.

Jan. 13, 1988.

---

John R. Embick, Philadelphia, Pa., for Pennsylvania Dept. of Environmental Resources.

David Thompson, Shelia Jones, Margaret Hutchinson, Maureen Barden, for U.S. Environmental Protection Agency.

Susan LeGros, David Marion of Montgomery, McCracken, Walker & Rhodes, Philadelphia, Pa., for non-party landfill users (the "potentially responsible parties").

## OPINION

LOUIS H. POLLAK, District Judge.

Joanne R. Denworth, Esq., the court-appointed Receiver of Moyer's Landfill, a hazardous waste site located in Lower Providence Township, Montgomery County, Pennsylvania, is responsible for supervising cleanup of that site pursuant to a Consent Decree entered on July 16, 1982. Receiver Denworth now moves the court to join as defendants in this action the United States Environmental Protection Agency (EPA) and a class of transporters and generators of the waste deposited at the landfill, and to enforce the 1982 Consent Decree. For the reasons that follow, EPA will be joined as a defendant in this action, the companies allegedly responsible for generating and transporting waste will not be joined, and the Consent Decree will be enforced in part in order to ensure that existing financial obligations that were to be paid under the Consent Decree are satisfied. In all other respects, this court defers to EPA to plan, implement and fund the cleanup at Moyer's Landfill.

A group of citizens filed the complaint in this case on October 3, 1980, under citizen-suit provisions of the Federal Water Pollution Control Act, as amended, 33 U.S.C. § 1251 *et seq.* (the "Clean Water Act"), and of the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1979, 42 U.S.C. 6901 *et seq.* ("RCRA"), as well as under the statutory and common law of Pennsylvania. Plaintiffs sought the cleanup of Moyer's Landfill, which had for many years been a site for the disposal of waste, including solid

Franklin Poul, Joseph Manko of Wolf, Block, Schorr & Solis–Cohen, Philadelphia, Pa., for Court-appointed receiver Joanne Denworth.

Robert Emmet Hernan, Philadelphia, Pa., for private plaintiffs.

waste and hazardous waste. Contaminated water, known as leachate, had been seeping from the landfill into nearby Skippack Creek, polluting the water supply of the landfill's residential neighbors. Trash and odors at the landfill were inadequately contained.

At the time the plaintiffs filed their complaint, the citizen-suit provisions of the Clean Water Act and RCRA did not allow for suits against transporters and generators of waste. Plaintiffs therefore sued Moyer's Landfill, Inc., and Paul Lanigan and Howard Moyer, Jr., owners and operators of the landfill site.[1] Following a bench trial, I found defendants to be in violation of the Clean Water Act and RCRA, directed defendants to repair existing leachate collection facilities, and directed the parties to submit a proposed further Order outlining measures to stop leachate leakage from the landfill. *O'Leary v. Moyer's Landfill,* 523 F.Supp. 642, 659 (E.D.Pa.1981).

By Order dated July 16, 1982, I entered a Consent Decree. The Decree provided for the appointment of a Receiver to take possession of the assets of the landfill and those of its owners and operators. It awarded judgment, to be paid out of those assets, against the landfill owners and operators, and in favor of the private plaintiffs and DER,[2] for the amount necessary to close the landfill in the manner specified in the Consent Decree and accompanying Final Closure Plan. The Final Closure Plan outlines a program for leachate management, limited additional waste disposal, ground water and gas monitoring, and, as the highest remedial priorities, grading, cover and revegetation of the landfill site. The Decree specifies that certain obligations, such as the Receiver's own fee, her counsel's fees, authorized expenses of the receivership, and private plaintiffs' counsel's fees, were to be satisfied from the landfill assets.

As envisioned in the Decree, the assets of the landfill included proceeds from continued but limited waste disposal at the site, and from commercial extraction of landfill gases. Regarding gas extraction, the Decree provides:

> The parties have agreed to and the Court has approved the terms of a gas lease ... for the commercial extraction of landfill gases from the landfill.... The Receiver shall receive all revenue due ... under the gas lease.... The Receiver shall enforce the terms of the gas lease, and otherwise act for lessors in making any determinations necessary under the terms and conditions of the gas lease, until the Court shall otherwise order.

Consent Decree, ¶ 14. Because of uncertainty at the time the Decree was entered regarding the practicability of gas recovery, the gas lease appended to the Decree contained two conditions:

> (1) that site does in fact contain sufficient landfill gas of appropriate quality and quantity in order to be considered commercially exploitable;
>
> (2) that all of the necessary permits for gas exploitation have been obtained.

If either condition is not met, the lease agreement provides for its own termination. *See* Landfill Gas Lease, ¶ 1(b)–2, Exhibit C to Consent Decree.

---

1. Plaintiffs also initially named the Pennsylvania Department of Environmental Resources (DER) as a defendant, but on December 23, 1980, I granted DER's motion to dismiss. *See O'Leary v. Moyer's Landfill,* 523 F.Supp. 642, 646, 647–48 (E.D.Pa.1981).

2. DER entered the suit as a plaintiff by Stipulation and Order of July 10, 1981. While I was considering proposals for relief in the citizen suit, DER had petitioned under Pennsylvania law in the Commonwealth Court for a preliminary injunction directing landfill owners and operators Moyer's Landfill, Inc., Howard Moyer, Jr., Paul Lanigan, Catherine Moyer and Grange Environmental, Inc., to comply with DER's Order of June 26, 1981. The DER Order directed defendants to conduct daily removal of leachate from the landfill, and to collect and contain leachate remaining on the site. To facilitate coordinated resolution of the private plaintiffs' and DER's claims against defendants, the parties agreed by stipulation to transfer DER's state case to this court and to consolidate it with the private plaintiffs' action. I entered a preliminary injunction requiring defendants to comply with DER's Order of June 26, 1981. *O'Leary v. Moyer's Landfill, Inc.,* 523 F.Supp. 659 (E.D.Pa.1981).

On December 11, 1980, approximately two months after the private plaintiffs' complaint in this case was filed, Congress enacted the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), Pub. L. 96–510, 94 Stat. 445 (codified as amended at 42 U.S.C. § 9601 *et seq.*). As a hazardous waste site, Moyer's Landfill is covered by CERCLA in addition to being covered by the Clean Water Act and RCRA. CERCLA gives EPA the choice between implementing a cleanup itself and ordering private parties to do so. 42 U.S.C. § 9604. EPA can sue to recover cleanup expenses from responsible transporters and generators, 42 U.S.C. § 9607. CERCLA also creates a Hazardous Substance Response Trust Fund (Superfund) which EPA may tap for some of its CERCLA actions. 42 U.S.C. § 9631.

The Superfund Amendments and Reauthorization Act of 1986, Pub. Law 99–499, 100 Stat. 1613 (SARA), which is now part of CERCLA as currently codified, further modifies and funds EPA's action under CERCLA. Those amendments also contain a citizen-suit provision.

In September 1983, almost two years after the judgment and more than a year after I entered the Consent Decree in this case, EPA listed Moyer's Landfill on its National Priority List pursuant to regulations enacted under CERCLA and referred to as the National Oil and Hazardous Substances Pollution Contingency Plan (NCP). 48 Fed.Reg. 40658, 40672 (September 8, 1983). Soon thereafter, EPA began to investigate the site to determine appropriate remedial action through a Remedial Investigation/Feasibility Study (RI/FS) process, which requires public participation.

The Receiver had meanwhile proceeded to do her work as required under the Consent Decree and accompanying Closure Plan. This work has included preparation of a plan for closure and some site work to cover, grade and re-vegetate exposed areas of the landfill, design of leachate collection systems, preparation for leachate treatment including conducting treatability studies and applying to DER for a permit to allow leachate treatment at the landfill site, and development of a plan for methane gas recovery. During the period when EPA was conducting its RI/FS and inviting public participation, the Receiver developed and submitted a remedial plan consistent with her obligations under the Consent Decree.

Pursuant to its obligation under the NCP to involve the public in the RI/FS process, EPA notified several of the transporters and generators of landfill waste (PRPs)[3] that EPA had begun to study remedial alternatives. Some of the PRPs formed a committee to negotiate with EPA regarding cleanup of the landfill. Lengthy negotiations took place between the PRPs and EPA, with the participation of the Receiver and DER.

When EPA concluded its RI/FS, it issued a Record of Decision (ROD) on September 30, 1985, setting forth its evaluation of various remedial alternatives. The ROD lists the data received by EPA for feasibility and cost-effectiveness. It then presents its choice of a preferred remedy and one alternative remedy, as follows:

*Description of the Selected Remedy:*

After careful review and consideration of site areas identified in the Remedial Investigation which warrant remedial action, and of all alternatives developed by EPA in the Feasibility Study and the alternative developed by the site receiver in the Addendum to the Feasibility Study, the site receiver's methane gas generation/recovery alternative can be implemented at the Moyer Landfill Site. This phased alternative will meet the Superfund goals of minimizing present and future migration of hazardous substances and protect human health and the environment, while also attaining all applicable and relevant Federal public health and environmental standards, guidances and advisories at the point of closure (10 to 20 years).

---

**3.** Transporters and generators of waste are among those referred to as "potentially responsible parties" (PRPs) under CERCLA. For the sake of simplicity, the transporters and generators that the Receiver seeks to join are hereinafter referred to as PRPs.

Specifically this option proposes:

—Soil cover with a permeability of $10^{-4}/10^{-5}$ cm/sec

—Erosion and sedimentation control measures

—Surface water diversion

—Leachate collection, treatment and discharge

—Methane gas recovery and sale

—Security/fencing measures

—Ground water monitoring

—All closure activities in compliance with RCRA at the conclusion of gas generation phase (10 to 20 years).

This alternative contemplates broad remedial work and its implementation will depend upon the success of the gas generation/recovery program and the contributions from generators and other potentially responsible parties (PRPs). If negotiations with the PRPs fail and/or the methane gas alternative fails, EPA and PADER [Pennsylvania Department of Environmental Resources] recommend Remedial Action Alternative 4.2. This alternative is the cost-effective remedy and will satisfy as well all of the contamination and migration objectives identified in the Remedial Investigation.

Specifically this option proposes:

—Miscellaneous work preparatory to installations of RCRA cap: grading, flattening of steep slopes, retaining walls and installations of rip-rap at areas that are most likely to be eroded.

—Gas venting and gas monitoring.

—Surface water collection and discharge to Skippack Creek.

—Leachate collection and treatment that will meet the $10^{-6}$ risk level in the ground water and discharge requirements in the stream.

—Operation and Maintenance: ground and surface water monitoring, maintenance of the cap and treatment of leachate.

The ROD proceeds to describe the site in some detail, and to present a comparative evaluation of the alternatives that EPA considered.

On November 22, 1985, after EPA had issued its decision, the PRPs submitted to EPA a third alternative to both remedial plans approved in the ROD. The PRPs' plan is similar to the Receiver's Alternative. It contemplates commercial gas recovery under the Receiver's auspices, but calls for a synthetic landfill cap less permeable than the soil cap envisioned by the Receiver's Alternative, and a smaller on-site leachate treatment plan. The PRPs contend that it is the least expensive of the three plans. This third alternative became the focus of continued settlement negotiation among EPA, DER, the Receiver, the PRPs, and the private plaintiffs.

By May, 1986, the parties to the negotiation had reached an agreement in principle that would have satisfied the Receiver's obligations under the Consent Decree, allowed EPA to play an active regulatory role consistent with its understanding of its obligations under CERCLA, and obviated the need for adjudication of the Receiver's motion to enforce the Consent Decree. The agreement, as described in a conference on the record on October 3, 1986, envisioned: (1) gas recovery conducted by the Receiver and her contractor; (2) site clean up and closure by EPA in a manner compatible with gas recovery, to be funded 50 per cent by contributions offered by PRPs in settlement of claims against them and 50 per cent by the Superfund, with EPA seeking to recover half of the Superfund contribution from nonsettling PRPs; and (3) operation and maintenance of ongoing aspects of the remedy under the Receiver's auspices for the first five years or until gas recovery was completed and under DER's auspices thereafter, with DER paying 50 per cent and settling PRPs paying 50 per cent of the operation and maintenance costs as estimated in the settlement agreement. DER was to use proceeds from gas recovery and other funds earmarked for the purpose to pay any operation and maintenance costs that might be incurred beyond those estimated in the agreement.

After the 1986 elections and the subsequent change of administration in Harrisburg, the prospects for agreement that had appeared so promising turned sour. By

letter dated April 2, 1987, DER announced a "significant change of position," withdrawing its offer to help fund the operation and maintenance of the cleanup. According to DER's letter, the proposed settlement agreement was presented to the new Secretary of DER, and the new Deputy Secretary for Environmental Protection, who decided to disengage from the position previously taken by DER. The new DER leadership feared that entering into a settlement agreement might establish precedent unnecessarily unfavorable to the Commonwealth. In its letter, DER asserted that funds were available from PRPs and that its contributions were therefore unnecessary. It interpreted the October, 1986 amendments to CERCLA as establishing that state participation in settlement agreements such as that which had been tentatively reached with regard to Moyer's Landfill was not statutorily required. In the Department's view, it had committed itself under the settlement to do more than it might be required to do under the new amendments. DER also expressed concern that if PRPs were released by the settlement from future liability and if the proposed remedy failed, the Commonwealth might be liable for subsequent remedial actions.

Even after DER expressed its unwillingness to proceed with the original settlement proposal, the interested actors persevered in their negotiations, attempting to respond to DER's concerns, to ensure whatever limited participation DER might agree to, and to assign to others the responsibilities DER was no longer willing to assume. But the gap created by DER's 1987 withdrawal from its 1986 undertakings was too large to be filled, and the entire closely textured agreement, so carefully stitched together, unravelled. By the end of June, 1987 the negotiations had reached an impasse. Thereupon, the parties and the court turned their attention to the Receiver's motion to enforce the 1982 Consent Decree.

## THE RECEIVER'S MOTION

Now before the court is the Receiver's Motion for Enforcement of the Court's Remedy, as embodied in the Consent Decree approved and entered on July 16, 1982. The Receiver moves to join EPA and the PRPs as defendants to this lawsuit, and to have the court certify a class of PRPs, with members of the PRP committee as class representatives. She further moves the court to schedule a hearing on remedial alternatives for the landfill, to select an appropriate remedial plan, and to designate who shall implement the plan and who shall bear the costs of that implementation. In the memorandum of law accompanying her motion, the Receiver specifies that she seeks an order directing that any action to clean up Moyer's Landfill be consistent with the remedy outlined in the Consent Decree, and enjoining any remedial action inconsistent with that original remedy.

Four groups have responded to the Receiver's motion: the private plaintiffs; DER, which entered the case as a plaintiff in 1981; and EPA and the PRPs, whom the Receiver seeks to join.

DER opposes the Receiver's motion on the ground that its adjudication will further delay cleanup of the landfill. DER argues that, in the absence of a settlement with the PRPs, EPA is likely to clean up the landfill under CERCLA more quickly than would the Receiver under the Consent Decree.

The private plaintiffs support the Receiver's motion only insofar as the Receiver seeks to have EPA joined as a party defendant, and to have EPA enjoined from interfering with or obstructing methane gas recovery by the Receiver in accordance with the Consent Decree. The private plaintiffs' position with respect to all other aspects of the landfill cleanup is that they should be carried out by EPA under CERCLA.

EPA opposes the Receiver's motion on the ground that the court has no jurisdiction to consider any aspect of it. EPA takes the position that, since CERCLA was enacted, EPA has had exclusive authority to decide how to clean up hazardous waste sites and therefore the Receiver must step aside and allow EPA to proceed. EPA

maintains that CERCLA provides for review of EPA actions only after they have been carried out, and that EPA is additionally protected from the judicial review the Receiver seeks by sovereign immunity and by EPA's own primary jurisdiction over CERCLA cleanups.

The PRPs oppose the Receiver's motion to join them as additional parties and to certify a class of generators and transporters of waste. The PRPs' position is that the Receiver has moved too late to join them under the Consent Decree. They contend that the Consent Decree accorded complete relief to the parties of record five years ago, at a time when there was no jurisdictional basis for joining the PRPs. Because they have no authority over the landfill and do not seek in any way to obstruct the Receiver's remedial activities, the PRPs contend, there is no basis upon which to join them.

*Joinder of EPA—Procedural Propriety*

■ Joinder of EPA is procedurally appropriate under the Federal Rules of Civil Procedure. The Receiver points out that, unless EPA is joined, she faces inconsistent obligations under the Consent Decree on one hand, and under EPA's view of its own mandate on the other. Under the Consent Decree, the Receiver has responsibility for and control over the landfill, and has stewardship over a remedial plan the financing of which is substantially dependent on commercial exploitation of the landfill's methane gas. In EPA's view, however, the Receiver should step aside and allow it to take control of the landfill and implement its own remedy, regardless of any inconsistency between that remedy and the Consent Decree. In expressing its determination to proceed with its own cleanup, EPA has refused to give any assurance to the Receiver that gas recovery will be allowed, or that arrangements will be made to pay fees lawfully incurred and owing under the Consent Decree. In its response to the Receiver's motion, EPA does not address the procedural propriety of its joinder.

Rule 19(a), governing joinder, provides, in relevant part, that a person

> shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest

Fed.R.Civ.P. 19. EPA's joinder is necessary under rule 19(a)(2)(ii) to relieve the Receiver of the risk of inconsistent obligations.[4] As the Receiver acknowledges, although the joinder rules provide the procedural means for joining EPA, those rules do not themselves extend the court's subject-matter jurisdiction. The Receiver thus proposes equitable and statutory theories in support of the court's jurisdiction over the Receiver's motion against the two nonparties.

*Joinder of EPA—Jurisdictional Basis*

The Receiver had been working to carry out this court's final judgment when EPA initiated parallel but independent steps to clean up Moyer's Landfill. With two separate remedial efforts under way, all interested actors undertook to negotiate a single remedial scheme. Final agreement on an effective remedial plan appeared imminent—until DER changed its mind. And so the question arises as to who now has authority to select a remedy for the landfill and to govern the conduct of others with respect to the chosen remedy.

EPA assumes that the enactment of CERCLA vested in it the authority to take control of any landfill that presents the kind of hazards at which CERCLA was aimed. Incident to its power to take control, EPA asserts, it has exclusive jurisdic-

---

**4.** The propriety of joining EPA is unaffected by the fact that judgment has already been entered in favor of plaintiffs. *See* Fed.R.Civ.P. 21;

*DuShane v. Conlisk,* 583 F.2d 965, 967 (7th Cir. 1978).

tion over remedial selection and implementation, with any judicial review deferred until EPA has completed the cleanup. The agency apparently takes that position in this case despite the fact that this court's jurisdiction over the remedial efforts at Moyer's Landfill was established in litigation that predated CERCLA.

The Receiver, in contrast, assumes that the jurisdiction of this court over the landfill site, established prior to the enactment of CERCLA and continuing to the present by virtue of the receivership, remains exclusive and unaffected by CERCLA. Further, the Receiver views EPA's attempts to undertake the functions originally allocated by the Consent Decree to the Receiver as bringing EPA under this court's subject-matter jurisdiction. Thus, in her view, absent this court's approval, EPA may not utilize at Moyer's Landfill the authority and funds conferred on it by CERCLA.

### a. Ancillary Jurisdiction

 I find my jurisdiction regarding the landfill to be broad enough to allow me to grant the Receiver's request to join EPA as a party for the purposes of considering her motion for enforcement of the Consent Decree. As a judge sitting in equity I have authority to consider whether to enjoin EPA from interfering with the receivership Consent Decree.[5] The purpose of the appointment of a Receiver is to place certain property under the exclusive control of one individual, appointed by and accountable to the court, for as long as is needed to effectuate the final judgment of the court free from interference by other tribunals. The court accordingly retains ongoing jurisdiction for the duration of the receivership over claims arising with respect to the property in the Receiver's control as a means of protecting the court's own judgment.[6] *See* Pt. 2 Moore's Federal Practice

---

5. Although not necessary to my holding that my equitable power allows me to join EPA in this action, RCRA does provide an alternative, potential basis for this court's jurisdiction over the dispute between the Receiver and EPA. As the Receiver points out, she has standing as a citizen, apart from her court-appointed role, and she therefore could have brought a separate citizen suit against EPA under 42 U.S.C. § 6972(a)(1)(A). That subsection allows citizens to bring suit

> against any person (including (a) the United States, and (b) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter.

The Receiver argues that "EPA's remediation of the site contrary to the Consent Decree approved by this court would bring EPA in violation of this court's order, which was an order entered pursuant to RCRA." Memorandum of Law in Support of Receiver's Motion for Enforcement of this Court's Remedy, at 9.

EPA responds that the only "orders" upon which citizen suits may be based are the agency's own compliance orders, and that because the Consent Decree that the Receiver seeks to enforce is not such an order, RCRA provides no jurisdictional support for her motion. Compliance orders may be issued pursuant to 41 U.S.C. § 6928(a)(1), which provides, in relevant part:

> whenever on the basis of any information the Administrator determines that any person is in violation of any requirement of this subchapter, the Administrator may issue an order

requiring compliance immediately or within a specified time period....

The legislative history of RCRA's citizen suit-provision, 42 U.S.C. § 6972(a)(1)(A), does not indicate that its definition of "order" is as limited as EPA contends. *See* H.R.Rep. 1491 94th Cong. 2d Session Pt. 1, at 69, *reprinted in* 1976 U.S.Code Cong. & Admin.News, 6238, 6307. Moreover, the extensive list of legal mandates—"permit, standard, regulation, condition, requirement or order"—the violation of which can form the basis of a citizen suit suggests a legislative intent to make such suits broadly available. In that context, construing "order" as narrowly as EPA proposes would be incongruous. Therefore, although the Receiver has not filed a citizen suit against EPA under section 6972(a)(1)(A), the apparent availability of such a suit provides an alternate, wholly independent, potential basis for this court's jurisdiction to join EPA.

6. The differing jurisdictional positions of EPA and of the Receiver raise the prospect of potential physical conflict flowing from the simultaneous implementation of parallel remedies that may be incompatible. The need to obviate any possible conflict supports this court's jurisdiction over the landfill. Comparable problems have been presented by competing state and federal court assertions of authority over disputes involving property. Justice Frankfurter, writing for the Court in *Toucey v. New York Life Ins. Co.*, 314 U.S. 118, 135, 62 S.Ct. 139, 144, 86 L.Ed. 100 (1941), explained that when such a problem arises in that context, the jurisdiction of the court first controlling a particular piece

¶ 66.07[3] (Jurisdiction of Suits By and Against Receivers). Federal Rule of Civil Procedure 66 provides that "[a]n action wherein a Receiver has been appointed shall not be dismissed except by order of the court." Paragraph 16(f) of the Decree in this case explicitly requires such a court order before the obligations of the Decree can be terminated:

> After the Receiver has satisfied all obligations as set forth above, the parties shall have the right to petition the court, upon five days prior notice to all other parties, for the modification or termination of the Receivership.

In the context of an action by a Receiver to accomplish the goals of the receivership, the Supreme Court has applied the equitable principle of ancillary jurisdiction to hold that "jurisdiction of these subordinate actions or suits is to be attributed to the jurisdiction on which the main suit rested." *Pope v. Louisville, New Albany & Chicago Ry. Co.*, 173 U.S. 573, 577, 19 S.Ct. 500, 501, 43 L.Ed. 814 (1899).[7]

█ The jurisdiction of this court is not restricted by the authority of EPA under CERCLA. CERCLA does not purport to direct EPA to take over ongoing environmental litigation that predates the statute's enactment. Any effort that Congress might have made to divest federal district courts of their jurisdiction over litigation already begun, and to deprive individuals of monies owed to them pursuant to a remedy already ordered, would raise serious due process questions and also substantial questions with respect to legislative interference with Article III functions. In the absence of an explicit statement by Congress in CERCLA showing its intention to interfere with vested district court jurisdiction and judicially-mandated remedies, I am obligated to read CERCLA as avoiding the constitutional questions that would be raised by such interference.

To the extent that CERCLA speaks to this issue, it suports the view that Congress did not intend CERCLA to interfere with existing cases in federal district court. Section 9613(d) shows that Congress did not regard the passage of CERCLA as constituting relief that would substitute for that which private plaintiffs might be seeking in litigation that was ongoing when CERCLA was passed in December, 1980. CERCLA § 9613(d) states:

> No provision of this chapter shall be deemed or held to moot any litigation concerning any release of any hazardous substance, or any damages associated therewith, commenced prior to December 11, 1980.

This provision confirms that CERCLA has no impact on the jurisdiction this court has exercised in this matter since October 3, 1980.

b. Timing of Review

EPA's principal objection both to its own joinder and to the court's consideration of the Receiver's motion on its merits is that, in EPA's view, the statutory provisions regarding the timing of judicial review of EPA cleanup initiatives preclude this court from exercising any further authority over Moyer's Landfill unless and until EPA acts in a fashion that triggers the statutory judicial-review scenario. SARA section 113(h), 42 U.S.C. § 9613(h), reads as follows:

---

of property must remain exclusive until proceedings in that forum are concluded because "[c]ontest between the representatives of two distinct judicial systems over the same physical property would give rise to actual physical friction." *Cf. also Kline v. Burke Constr. Co.*, 260 U.S. 226, 43 S.Ct. 79, 67 L.Ed. 226 (1922).

**7.** It is consistent with the purposes of a receivership to construe an order appointing a Receiver as intended to preclude even non-parties from interfering with property in the Receiver's hands: "After the [receivership] court has actually or constructively taken control and possession of the property, it is not necessary for the court to enjoin strangers from interfering with the property...." II R.E. Clark, A Treatise on the Law and Practice of Receivers § 625.1(b) at 1025 (3d ed. 1959). This is true even where the interference comes from otherwise authorized government actors. "After the appointing court has appointed a receiver of defendant's property and until the receivership is lifted or closed, no other court or sheriff, or other state or federal officer can proceed to appropriate the property by sale or otherwise." *Id.* § 624(b) at 1020, *citing Heidritter v. Elizabeth Oil–Cloth Co.*, 112 U.S. 294, 5 S.Ct. 135, 28 L.Ed. 729 (1884).

*Timing of review*

No Federal court shall have jurisdiction under Federal law other than under section 1332 of Title 28 (relating to diversity of citizenship jurisdiction) or under State law which is applicable or relevant and appropriate under section 9621 of this title (relating to cleanup standards) to review any challenges to removal or remedial action selected under section 9604 of this title, or to review any order issued under section 9606(a) of this title, in any action except one of the following:

(1) An action under section 9607 of this title to recover response costs or damages or for contribution.

(2) An action to enforce an order issued under section 9696(a) of this title or to recover a penalty for violation of such order.

(3) An action for reimbursement under section 9606(b)(2) of this title.

(4) An action under section 9659 of this title (relating to citizens suits) alleging that the removal or remedial action taken under section 9604 of this title or secured under section 9696 of this title was in violation of any requirement of this chapter. Such an action may not be brought with regard to a removal where a remedial action is to be undertaken at the site.

(5) An action under section 9606 of this title in which the United States has moved to compel a remedial action.

EPA suggests that these provisions bar the Receiver from invoking this court's jurisdiction until EPA sues the PRPs to assess costs against them for the cleanup of Moyer's Landfill. EPA argues that "the courts have consistently held that Congress never intended to authorize review of EPA's remedial actions or cleanup orders prior to EPA's bringing a lawsuit to force responsible parties to conduct a cleanup, or to assess costs against responsible parties for a cleanup conducted by EPA." Memorandum of Law of the United States in Opposi-

tion to the Receiver's Motion for Enforcement of the Court's Remedy, at 16.

The legislative history of § 9613(h) for the most part discusses timing of review of suits by transporters and generators resisting EPA's efforts either to seek cost recovery from them or to enforce an injunctive order compelling them to conduct cleanup. It was in this context that the House Energy and Commerce Committee asserted that under CERCLA "there is no right of judicial review of the Administrator's selection and implementation of response action [*sic*] until after the response actions have been completed to their completion. [*sic*]" H. Rep. No. 253 Pt. I, 99th Cong., 2d Sess. 81, *reprinted in* 1986 U.S.Code Cong. & Admin. News 2835, 2863. Several members of the Energy and Commerce Committee [8] stated that the purpose of provisions eventually codified in § 9613(h)

is to prevent private responsible parties from filing dilatory, interim lawsuits which have the effect of slowing down or preventing EPA's cleanup activities. By limiting court challenges to the point in time when the agency has decided to enforce the liability of such private responsible parties, the amendment will ensure both that effective cleanup is not derailed and that private responsible parties get their full day in court to challenge the agency's determination that they are liable for cleanup costs.

*Id.* at 266, 1986 U.S.Code Cong. & Admin. News at 2941. *See also* H.R. Conf. Rep. No. 962, 99th Cong., 2d Sess. 224 *reprinted in* 1986 U.S.Code Cong. & Admin. News 3276, 3317; *Lone Pine Steering Committee v. United States Environmental Protection Agency,* 777 F.2d 882 (3d Cir.1985).

■ Whether the Receiver's motion would be precluded by the timing-of-review provisions were she a citizen coming into court now for the first time to seek review under CERCLA of the merits of EPA's final remedial selection as compared with some alternative proposed as superior is

---

**8.** The views referred to here are those printed as Separate and Dissenting Views to those expressed in the main Committee report, but they do not appear to dissent from the views of the Committee in this particular respect.

not the question now before me.[9] It may be that § 9613(h)(4) should be understood as precluding the *initiation* of a suit seeking review of EPA actions taken to select and begin to implement a remedy under CERCLA. But Section 9613(h)(4) is not to be read as authority for the proposition that a court must suspend ongoing litigation which antedates the very statutory framework under which EPA asserts its exclusive jurisdiction. The main policy behind the timing-of-review provision is the avoidance of delay in cleaning up dangerous waste sites. In the view of Congress, allowing layers of judicial review to come between EPA's identification of waste problems and its ability to do something to fix those problems undermines the public interest in rapid, effective waste cleanup that CERCLA was designed to promote. Where remedial efforts have proceeded under other auspices prior to CERCLA, however, with substantial work having been done by others, Congress has expressed no opposition to the courts' retention of jurisdiction to decide on a more flexible, case-by-case basis how most effectively to complete the cleanup. Congress' restraint in this respect is consistent with its aim under CERCLA to have as many hazardous waste sites cleaned up as quickly as possible. Where a cleanup is already in progress, it might well be the intervention of EPA starting the remedial process over from the beginning that would cause unnecessary delay. Therefore, in the rare circumstances in which substantial remedial efforts predate any EPA action under CERCLA, barring judicial review is unwarranted by the words of the statute and by its underlying policies.

c. Sovereign Immunity

■ EPA next argues that it is protected from inclusion in this action by sovereign immunity. As EPA points out, the United States cannot be sued in either federal or state court without its consent, and that consent must be expressed in a specific waiver of immunity. The Administrative Procedure Act, 5 U.S.C. § 701 *et seq.,* however, specifically establishes such a waiver with respect to equitable suits against administrative agencies. Section 702 of title 5 provides, in relevant part:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

As the Senate Report makes clear, this waiver of sovereign immunity is broad: the Administrative Procedure Act was "designed to afford a legal remedy for every wrong." S.Rep. No. 752, 79th Cong. 1st Sess. 7 (1945). The APA remits the Agency to other available defenses, thereby promising to "provide a much more rational basis for controlling unnecessary judicial interference in administrative decisions than does the defense of sovereign immunity." H.R.Rep. No. 1656, 94th Cong. 2d Sess. 4—5, *reprinted in* 1976 U.S.Cong. Code & Admin.News at 6121, 6124—25. Given the availability of other defenses that rely more frankly on factors relevant to the allocation of the functions between the courts and administrative agencies, Congress understood that, under the APA, "the policy against indiscriminate judicial interference with Government action would not be abandoned by eliminating the defense of sovereign immunity." *Id. See id.,* H.R.Rep. at 25, USCCAN at 6145, Exhibit C (letter of May 10, 1976 from Antonin Scalia, Assistant Attorney General, to Senator Edward M. Kennedy, Chairman, Subcommittee on Administrative Practice and Procedure).

**9.** *But cf. supra* note 5, at 815, discussing the apparent viability of a citizen suit were the

Receiver to bring one under RCRA.

In view of the foregoing discussion of the procedural and jurisdictional bases upon which EPA may be joined, and in view of the inapplicability of EPA's timing-of-review and sovereign-immunity defenses, EPA is now joined as a defendant in this action.

*Joinder of the PRPs*

The Receiver seeks to join the PRPs, so that their resources may be employed in carrying out the Decree. The Receiver argues that the court has ancillary jurisdiction over the PRPs incident to its power to hear all motions by the Receiver seeking to accomplish the goals of the Consent Decree. The Receiver also contends that, although the original plaintiffs did not sue the PRPs, the Hazardous and Solid Waste Amendments of 1984 add to RCRA a provision for citizen suits against transporters and generators of waste and thereby create a jurisdictional ground that justifies bringing the PRPs into the original suit.

The PRPs oppose the Receiver's motion to join them on procedural rather than jurisdictional grounds. The PRPs contend that their joinder is inappropriate because the requirements of the joinder rules, Fed.R.Civ.P. 19 and 20, and of the class action rule, Fed.R.Civ.P. 23, are not satisfied.

Even assuming that joinder may be procedurally appropriate, I noted above that no joinder may be made in the absence of a jurisdictional basis for the claims against the party to be joined as a defendant. Although the ancillary jurisdiction of this court sitting in equity is clearly broad enough to enable it to address interference with the receivership Consent Decree, equitable principles do not so readily support expanding the scope of the litigation by drawing on the resources of the PRPs affirmatively to assist the Receiver in achieving the goals of the receivership. EPA is joined in order to allow consideration of the extent to which the Consent Decree should be protected as originally entered. The PRPs' joinder would not be necessary for the Decree to be protected because access to their financial resources was not contemplated by the Decree.

The fact that the PRPs had no role in the remedial scheme as originally established by the Consent Decree is explained, in the Receiver's view, by the absence of any statutory authority under which the private plaintiffs could have sued them. The Receiver contends that such authority now exists, under the 1984 amendments to RCRA, and that the Consent Decree should accordingly be broadened to include the PRPs. Given that remedial action has already begun at the site, however, suit against the PRPs under RCRA is now barred. The limitations on citizen suits against transporters and generators of waste are set forth in 42 U.S.C. § 6972(b)(2)(B), which provides, *inter alia,* that

No action may be commenced under subsection (a)(1)(B) of this section if the Administrator, in order to restrain or abate acts or conditions which may have contributed to or are contributing to the activities which may present the alleged endangerment—

. . . .

(iii) has incurred costs to initiate a Remedial Investigation and Feasibility Study under section 104 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 [42 U.S.C. § 9604] and is diligently proceeding with a remedial action under that Act [42 U.S. C. § 9601 et seq.].

EPA has undertaken a RI/FS, and the Receiver does not challenge EPA's diligence. Thus, RCRA precludes citizen suits against the PRPs under the current circumstances, and therefore does not provide a jurisdictional basis for joinder of the PRPs. The Receiver's motion to join the PRPs as defendants is accordingly denied.

## MERITS OF THE RECEIVER'S MOTION

*Primary Jurisdiction*

EPA argues that, even if this court has jurisdiction to join EPA, I should deny the Receiver's motion in deference to the Agency's primary jurisdiction to clean up Moyer's Landfill. EPA contends that CERCLA demonstrates Congress' intent to delegate

decisions about remedying hazardous waste sites to the Agency. The Receiver responds that the doctrine of primary jurisdiction provides for a stay of judicial action only until the Agency has exercised its expertise, and that in view of the fact that EPA has already approved the Receiver's Alternative as environmentally sound, there is no reason for the court to continue to stay its hand.

The primary jurisdiction doctrine is a means of allocating initial dispositive authority between an administrative agency and a court when both have the capacity to decide the same issue. The doctrine of primary jurisdiction is relevant to this case: EPA does not have exclusive authority over the cleanup at Moyer's Landfill; but since EPA does have responsibility for the site to the extent that this court does not, its authority is concurrent with that of this court.

In applying the primary jurisdiction doctrine, courts have inquired whether the uniform treatment of and expert insights into a given subject matter that agency determinations can provide are needed in the case under consideration. *See United States v. Western Pacific R.R. Co.,* 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956); *Cheyney State College Faculty v. Hufstedler,* 703 F.2d 732, 736 (3d Cir.1983). The more flexible procedures available to an administrative agency may also be a consideration in a court's decision to defer to the competent agency in a particular area of the law. *See Far East Conf. v. United States,* 342 U.S. 570, 575, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952). If a court determines that it would be appropriate to defer to an administrative agency, it then delays its consideration pending the agency's disposition of the dispute, or even of a single issue.

The question here is whether and to what extent factors supporting judicial deference to the primary jurisdiction of EPA are present. As the Receiver points out, EPA appears to have already applied its expertise with respect to the questions raised by the Receiver's motion. The Receiver has requested that this court consider three issues: which remedy should be implemented at the landfill, who should implement that remedy, and who should bear the costs of the remedy. EPA has already expressed its final judgment regarding the appropriate cleanup plan for the landfill. EPA has also already stated its views—and emphasized their finality—that it should implement the cleanup plan under CERCLA § 9604, and that funding should come from the PRPs under § 9607 after the cleanup is completed. In designating particular PRPs and giving them notice under CERCLA, EPA has quite specifically decided who should bear the remedial costs.

■■■ This court is not required as a matter of primary jurisdiction to defer to EPA with respect to the first of the three issues raised by the Receiver's motion, because, as noted, EPA has already applied its expertise to evaluate remedial options and has expressed its final choice, the details of which the court now has before it. In the circumstances of this case, however, I am not convinced that EPA's special competence has been exhausted with respect to the second and third issues—implementation and funding of a cleanup plan. Although EPA has also expressed its views with respect to implementation and funding, its special competence in those areas is not limited to voicing an informed opinion on who would be the appropriate persons to perform those tasks. EPA is also empowered by CERCLA to employ its own unique procedures and administrative resources to carry out those functions. EPA's special capacities in these respects are broader than those of this court and the Receiver, and are generally protected from judicial interference by the timing-of-review provisions. In the context of this case, I have concluded that the timing-of-review provisions do not apply to the Receiver's motion, but the doctrine of primary jurisdiction allows for case-specific inquiry regarding the extent to which judicial review should be deferred pending EPA's exercise of its statutory powers. Because it appears that although this court need no longer defer to EPA with respect to remedial selection there is still much to be gained from leaving the issues of implementation and fund-

ing to EPA, I defer as a matter of primary jurisdiction to EPA to resolve those issues.[10]

### Enforcement of the Consent Decree

The Receiver has moved the court to enforce the Consent Decree that was approved and entered in this case, and under which several persons now have vested claims for remuneration. EPA meanwhile asserts its intention to proceed to implement its own remedy at the landfill site, and refuses to offer any assurance that even the specific financial obligations—to the Receiver and her contractor, and to counsel—that have arisen pursuant to the Consent Decree will be met if EPA takes control of the landfill.

 I elect to exercise my equitable discretion to retain jurisdiction over this litigation to the extent necessary to resolve the issue of remuneration of persons who worked to obtain the Consent Decree and to carry out their duties thereunder. Subject to resolution of that issue, I defer to EPA to implement and fund the remedy it has selected to clean up Moyer's Landfill. Although, as discussed above, EPA has expressed its views regarding remedial selection and the court therefore has the authority to make the final choice of the remedy to be implemented at Moyer's Landfill, equitable considerations support my conclusion that as long as it respects claims that have vested under the Consent Decree, EPA should be free to employ its own remedial plan. There is no reason to assume that this court is in a better position than is EPA to select the best remedy for the landfill. In approving the remedial option outlined in the Consent Decree, the court already exercised such informed judgment as it acquired under the parties' tutelage. When it developed its views of the best remedial plan for Moyer's Landfill, EPA had the benefit of the plan outlined in the Consent Decree, and of the Receiver's expertise and familiarity with the site. No change in circumstances has since added to this court's or the Receiver's expertise; the passage of CERCLA, however, has enhanced EPA's powers, its level of involvement, and its corresponding expertise, with respect to toxic waste cleanup. Because EPA will be responsible for implementation and funding of the remedial plan, it should be granted as much latitude in selecting that plan as is compatible with fulfillment of the Consent Decree obligations.[11]

My equitable decision regarding payment of debts to those persons who have worked conscientiously to bring a successful citizen suit under RCRA, and to start to implement the court-approved Consent Decree, is consistent with EPA's mandate to protect policies embraced by Congress when it provided for private enforcement of RCRA and the Clean Water Act, and may well be constitutionally required. I do not accept EPA's suggestion that CERCLA—a statute that complements rather than supplants prior environmental statutes—forbids EPA from both respecting the interests that have vested under the Consent Decree and proceeding with a remedy that in all other

---

**10.** I can envision circumstances that would warrant the court, rather than EPA, continuing to govern the cleanup of a landfill over which it took jurisdiction prior to the passage of CERCLA. In a case in which a remedy had been substantially completed by the time EPA attempted to initiate its own cleanup, or even in a case in which remedial efforts had proceeded to the point they have in this case under the Receiver's auspices, but for which adequate funding had been assured by responsible parties, the very concerns for prompt and effective cleanup that Congress expressed in creating CERCLA's innovative procedures would be best served by allowing parties to the lawsuit to complete what they had begun under judicial auspices. Ceding initial authority to EPA in such a case, and thereby obligating the agency to follow from their beginnings the steps CERCLA and the NCP would require it to take, might serve only to

delay completion of the cleanup and tie up funds better allocated by EPA to waste sites that had not already received extensive attention under a court-ordered consent decree. However, in my view this is not such a case.

**11.** EPA's enhanced power to implement and fund cleanups may depend on its having respected certain constraints during the remedial-selection stage. CERCLA requires that remedial selection and planning be carried out in conformity with the NCP and CERCLA. If EPA finances a cleanup out of the Superfund, and later sues for reimbursement from the PRPs, it must in that later suit justify its process of evaluation and selection of a remedy as in accordance with the regulatory and statutory scheme governing that process.

respects would be of its own choosing. This decision serves the policies of the statutes under which the landfill cleanup began and those of the statute under which it should be concluded. It also avoids the constitutional questions that would be raised by interference with the Consent Decree entered by this court in the exercise of its Article III authority.

 It is within the range of appropriate remedial options available to this court to ensure payment for the services rendered pursuant to the receivership, and for the fees of the private plaintiffs' lawyers, as contemplated by the Consent Decree. As a general rule, the expenses of a receivership are "a charge upon property or fund under the control of the court, without any personal liability therefor upon the part of the plaintiff, who invoked the jurisdiction of the court." *Atlantic Trust Co. v. Chapman*, 208 U.S. 360, 376, 28 S.Ct. 406, 411, 52 L.Ed. 528 (1908). The District Court for the Northern District of Illinois recently acknowledged the rule of *Atlantic Trust* that receivership expenses are ordinarily charged to the property, and further commented that, ultimately, "[i]t is up to the discretion of the court appointing the receiver as to who shall be charged with the costs of the receivership." *Donovan v. Robbins*, 588 F.Supp. 1268, 1271 (N.D.Ill.1984). If obligations incurred under a receivership remain outstanding when the property is released from the Receiver's control,

> a court can create against the property a charge or a burden, and can give title in the case of a sale provisionally, or can turn the property back to the original owner provisionally, subject to the payment of certain claims, and every one must take notice of the order of the court affecting this property.

I R.E. Clark, A Treatise on the Law and Practice of Receivers, § 270 at 416 (3d ed. 1959). Although in taking over cleanup at Moyer's Landfill, EPA will be taking control of the site only for the duration of the cleanup and will not gain formal title to the property itself, it has effectively asserted that it has control over the landfill's methane gas resources for the period of years required to complete the cleanup. Because the gas resources will presumably dissipate over time, however, EPA may not bar the Receiver from prompt recovery of the landfill gas in accordance with the Consent Decree unless it devises an alternative means of satisfying the financial obligations already outstanding against the landfill. To the extent that existing obligations in this case have not been satisfied when control over the property shifts to EPA, they do not evaporate.

Accordingly, the Receiver shall submit an accounting of fees and expenses incident to the receivership, and private plaintiffs shall submit an accounting of attorney's fees. The Receiver, private plaintiffs, DER, and EPA shall then submit a joint memorandum setting forth their proposals for payment of the Receiver's fees and expenses and private plaintiffs' attorneys' fees. When outstanding financial obligations to the Receiver herself, to the Receiver's and plaintiffs' counsel, and to contractors hired by the Receiver, have been satisfied and EPA takes over the process of cleaning up the landfill, the Receiver will no longer be obligated to proceed with the remedy outlined in the Consent Decree because her obligations will be eclipsed by EPA's work.[12]

An appropriate Order accompanies this memorandum.

### ORDER

For the reasons stated in the accompanying memorandum, it is hereby ORDERED AND DIRECTED that Receiver Joanne Denworth's motion for enforcement of the Consent Decree is GRANTED IN PART and DENIED IN PART as follows:

1) EPA is joined as a party defendant in this action;

---

**12.** In concluding this opinion, I think it appropriate to take note of the exemplary public service performed by Joanne Denworth as Receiver. Unfazed by the many obstacles in her path, that able lawyer has, for over five years, pursued the goals of the Consent Decree with intelligence, resourcefulness, diplomacy and unflagging determination. When the cleanup is at last complete, and new vegetation flourishes where once there was a wasteland, it would be fitting indeed if the name "Moyer's Landfill" were to give way to "Denworth Green".

2) A class of potentially responsible parties is not joined;

3) On or before February 3, 1988, the Receiver shall file an accounting of fees and expenses incident to the receivership, including attorney's fees, and private plaintiffs shall file an accounting of attorney's fees;

4) On or before February 17, 1988, the Receiver, private plaintiffs, DER, and EPA shall file a joint memorandum setting forth their proposals for payment of those expenses, to the extent they may be authorized by the court;

5) Once the court has approved a plan for discharge of the financial obligations provided for in the Consent Decree, EPA may proceed under CERCLA to implement and obtain funding for a cleanup plan of its own selection, provided that the cleanup is in all respects compatible with the plan for fulfillment of the Consent Decree obligations, as outlined either in an agreement or court order.