Eleanor F. WILSON, Richard F. Wilson, P.D. Chadderdon, Clinton E. Nelson, Virginia E. Nelson, Kathryn A. Kennedy, William Michael Kennedy, Mark R. Francis, C. Laverne Gangwish, and Toni A. Dodge, Plaintiffs,

v.

AMOCO CORPORATION, an Indiana corporation, Amoco Oil Company, a Maryland corporation, Burlington Northern Railroad Company, a Delaware corporation, and Steiner Corporation, a Nevada corporation, Defendants.

No. 96 CV–0124–B.

United States District Court, D. Wyoming.

Jan. 5, 1998.

Robert T. McAllister, Denver, CO, Kevin M. Shea, Denver, CO, J.N. Murdock, Casper, WY, for Plaintiffs.

Frank D. Neville, Casper, WY, Raymond W. Martin, Cheyenne, WY, Rosemary Beless, Peter Billings, Salt Lake City, UT, Gary E. Parish, Denver, CO, Thomas F. Ryan, Chicago, IL, Brent R. Kunz, Cheyenne, WY, for Defendants.

### ORDER ON MOTION FOR PRELIMINARY INJUNCTION

BRIMMER, District Judge.

This matter is before the Court on Plaintiffs' Motion for Preliminary Injunction. The Court, having reviewed the materials submitted and having heard testimony and argument, hereby FINDS and ORDERS as follows:

#### Background

Plaintiffs, citizens of Casper, Wyoming, allege that Defendants Amoco Corporation, Burlington Northern Railroad Company, and

Steiner Corporation, have discharged and released hazardous and toxic contaminants from their respective Casper facilities and in doing so have injured the public health and the environment as well as Plaintiffs' properties. Plaintiffs bring statutory claims under the citizen suit provisions of the Resource Conservation and Recovery Act and the Clean Water Act, and common law claims of trespass, nuisance, negligence, and indirect condemnation.

Currently before the Court is Plaintiffs' Motion for Preliminary Injunction. Plaintiffs allege the discharges from the Defendants' facilities present an imminent and substantial endangerment to human health and the environment, and seek a preliminary injunction requiring Defendants to contain the discharges and remediate the contaminated property. Before considering the merits of Plaintiffs' argument, it is necessary to document the history of each Defendant's Casper operations and describe the agency involvement, both state and federal, at the Defendants' respective Casper facilities.

### 1. Amoco

#### a. Operations History: Refinery and Tank Farm

From approximately 1912 until 1991, Amoco operated a 1500 acre Refinery and Tank Farm in Casper, Wyoming. The Refinery and Tank Farm were situated along the banks of the North Platte River; the Refinery abutted the south bank, the Tank Farm abutted the north bank. *See* Amoco Ex. X5, attached hereto as Attachment 1. Although the Refinery was dismantled when operations ceased in 1991, and the Tank Farm continues to operate only as a crude oil pipeline station and waste treatment facility, Amoco remains the owner of both properties.

While in operation, the Refinery generated numerous petroleum products, including petroleum fuels, lube oils, naphtha, propane, and fuel gas. As a result of spills, leaks, discharges, and the general operation of the Refinery, a substantial amount of contamination has accumulated underneath the Refinery property. This contamination is described as light non-aqueous phase hydrocarbons, or LNAPLs, which consist of the petroleum products described above as well as crude oil. It has been estimated that at one point as much as 800,000 barrels of contamination were in the soils and groundwater beneath the Refinery.[1] *See* Vol. II, p. 76. There is substantial evidence that this contamination has migrated off-site and impacted the North Platte River as well as non-Amoco properties to the north and east.

There is also evidence that dense non-aqueous phase liquids, or DNAPLs, may be present underneath the Refinery. Solvents of the type likely to be present along the cody shale as DNAPLs were used at the Refinery and compounds classified as DNAPLs were present in wastes generated by Refinery processes and operations. *See* Pls.Ex. 307, p. 5; Pls.Ex. 2, Comments, pp. 6, 9, 19–20, 21. Unlike LNAPLs, which float on water because they are less dense or lighter than water, DNAPLs are heavier than water and sink, collecting along the bedrock or cody shale. There has been no testing to determine the nature and extent of any DNAPL contamination at the Refinery. The consequence of finding DNAPLs may explain the lack of testing for them: significant cleanup costs that dwarf costs incurred in LNAPL cleanups.

In addition to the groundwater contamination, there is evidence of ubiquitous asbestos contamination on and in the soil at the Refinery. *See* Vol. II, p. 84, 181. Testing also has revealed concentrations of lead contamination so high as to be unsafe for residential land use, and soil concentrations of numerous contaminants in excess of EPA risk-based residential land use concentration standards. *See* Pls.Ex. 2, Review, p. 9 ¶¶ a & b; p. 10 ¶ c; p. 11 ¶ f; p. 12 ¶ h; p. 14 ¶ j; p. 16 ¶¶ o & p; p. 17 ¶ q.

Connected to the Refinery by pipeline is "Soda Lake." Soda Lake is located approximately 3 miles northeast of the Refinery, and is approximately one square mile in size. It received 1.75 to 2.0 million gallons per day of

---

1. To put the size of this plume in context, it has been represented as being the equivalent of 32,-000,000 gallons, or three times the size of the Exxon Valdez oil spill. *See* Vol. II, p. 8.

the Refinery's wastewater from June 21, 1957 through September 25, 1990. *See* Amoco Ex. E2, pp. 4–5. Wastes piped to the lake include API separator effluent, sanitary sewage, and softener sludge. Because of these discharges, there is a one to two feet deep layer of sludge on the lake bottom. *See* Amoco Ex. Q2, p. 8. Since 1990 Amoco has pumped water from the River into Soda Lake to maintain its elevation and "support a wildlife habitat." Amoco Ex. E2, p. 4.

As its name suggests, the Tank Farm consisted of numerous tanks used to store crude oil.[2] At one time over 120 storage tanks were located on the property. *See* Amoco Ex. Z1, p. 1. Most of these tanks were removed in the 1970s and 1980s, and only six tanks presently remain on the Farm. As at the Refinery, but to a far lesser extent, spills, leaks, and waste disposal have resulted in contamination of the Tank Farm property.

There is ample documentation of the operating conditions and practices at the Refinery and Tank Farm. Robert Breuer, a current Wyoming Department of Environmental Quality (WDEQ) employee but a former Amoco Environmental Control and Safety Coordinator at the Casper Refinery, testified that as early as 1984 there was a high level of employee concern regarding the dilapidated Refinery infrastructure and the lack of additional investments made to upgrade the facility. *See* Vol. II, p. 73. At times in his 11 year tenure at Amoco, Breuer observed seeps of hydrocarbon contamination along the banks of the North Platte River as well as Refinery pipes discharging directly into an inlet bay connected to the River itself. *Id.* at 77–78, 169. Breuer further recalled that the leakage rate at some points along the 850,000 linear feet of pipe underneath the Refinery was as high as 50%. *See* Vol. II, p. 79; Pls.Ex. 125.

As for contaminants on and in the soils, Breuer described the asbestos contamination as so widespread both at the Refinery and Tank Farm that it would be easier to state where asbestos was not located rather than

where it was located. *See* Vol. II, p. 84. Breuer specifically recalled a piece of asbestos on the Tank Farm that literally was "the size of a Volkswagen." *Id.* at 87. Breuer further recollected two areas near the edge of the Amoco property—described as the "Black Hills Bentonite acid sludge disposal area" and the "former crude bunker area"— as being "eight foot deep football fields" of contamination. *Id.* at 139–40. Finally, Breuer acknowledged that leaded gasoline tank bottoms had been buried or disposed of on the South Tank Farm and that crude tank bottoms had been disposed of on the North Tank Farm. *Id.* at 118–20, 142, 147. An attempt to install a monitoring well in the affected area north of the River proved unsuccessful because the oily sludge beneath the ground was not sufficiently stable to support the drilling rig, which was tilting and sinking into the waste. *Id.* at 148. In sum, Breuer's list of environmental concerns at the site included, but was not limited to, groundwater contamination, lead contamination, sulfuric acid contamination, asbestos contamination, benzene contamination, and various forms of contamination that potentially remain in the large volume of underground piping beneath the Refinery. *Id.* at 123, 128, 134.

Robert Madzy, a former Amoco employee responsible for asbestos contracts and pipeline maintenance, recalled asbestos as being "everywhere," and described the Refinery's underground pipes as "deteriorated and in some places ... almost nonexistent." *Id.* at 181, 185. Madzy, who directed the removal of the tanks after the facility closed, remembered "a lot of holes" in the tank bottoms. *Id.* at 193. Tank 55, which was located on the South Tank Farm and used to hold hazardous waste, was not removed, but merely repaired. At one point before a new tank bottom was installed in Tank 55, Madzy had the opportunity to inspect the old tank bottom; he found "40 or 50 holes in [the] bottom" of the tank. *Id.* at 193–94.

---

**2.** There were actually two Tank Farms, a North Tank farm, which is referred to here, that was north of the River, and a South Tank Farm, which was south of the River. The Court will refer to the North Tank Farm specifically as the Tank Farm, and when addressing the South Tank Farm will so state explicitly.

Madzy also recalled problems with the facility's heavy oil separator. That instrument, located next to the south bank of the River, separated water from oil and other solvents generated by the Refinery. *Id.* at 208–09. Because tons of these materials were collected in the separator's bottom bays, cleaning required the use of large vacuum trucks. *Id.* at 210. Following one of these periodic cleanings, Madzy noticed and patched numerous holes in the bottom of the separator. *Id.* at 211. He further observed that river water was penetrating one hole approximately six feet in diameter, and thus apparently assumed that the oils and solvents gathering at the bottom of the damaged separator had been in direct contact with the North Platte River or water hydrologically connected to it. *Id.* at 211–12. Although that specific hole was not patched, the separator was placed back in service. *Id.* at 212.

**b. Agency Involvement**

**(i) The Refinery**

Both the United States Environmental Protection Agency (EPA) and the Wyoming Department of Environmental Quality (WDEQ) are currently involved at the site; particularly with respect to the Refinery, however, there has been little investigation of any worth and essentially no remediation of the contaminated properties. Prior to agency involvement, Amoco's primary self-initiated containment efforts at the Refinery consisted of digging, in the 1920s, reclamation ditches to capture oil before it reaches the river, and installing, in the early 1980s, a barrier well system on the northern end of the Refinery to capture oil migrating to the River. *See* Amoco Ex. A, p. 14. Three wells were added to the barrier well system in 1997. Other smaller-scale efforts included a sewer dewatering project, surface grazing and soil removal, rye grass seeding, and snow fence installation. *See* Vol. II, pp. 155–56; Vol. III, p. 205.

Agency interest in the Refinery is longstanding. The EPA expressed concern as early as 1972 that hydrocarbon contamination from the Refinery could be impacting the North Platte River. *See* Vol. V, p. 59. Not until the late 1980s, however, did the EPA initiate the investigation process at the Refinery. In 1991, following a visual site inspection, a preliminary review, and completion of a RCRA Facility Assessment, the EPA issued a RCRA § 3008 corrective action order. *See* Amoco Ex. Q2, pp. 9–10.

The EPA issued its Final Administrative Order five years later, on April 1, 1996. That Order identified 37 areas at the Refinery and Soda Lake where the presence of contamination had either been suspected or confirmed. *See* Pls.Ex. 7.[3] As required by the Order, Amoco submitted to the EPA in December 1996 a Current Conditions/Release Assessment Report (CCRA). A CCRA is an early step in RCRA's investigative process, and occurs before the more exhaustive RCRA Facility Investigation Report, or RFI. *See* Amoco Ex. P6. Its purpose is to "assess the completeness and quality of the existing data to be used to define the nature and extent of any hazardous waste and hazard constituent releases ... at, or migrating from, the [Refinery]." Amoco Ex. Q2, p. 11. The CCRA is also used to determine if the conditions warrant the implementation of interim measures to prevent further harm to health or the environment before the long-term investigative and remedial processes are initiated. *See* Pls.Ex. 2, Letter, p. 2. Amoco's CCRA concluded that no interim measures, other than minor refinements to the barrier well system, were warranted. *See* Amoco Ex. V.

On November 4, 1997, the EPA responded to the CCRA, informing Amoco that "none of the information submitted in the CCRA is sufficient to support a decision to conclude the corrective action process at any portion of the [Refinery]. Further, the scant information provided is useful only in limited circumstances, and, at best, for general qualitative purposes." *Id.* In short, the EPA informed Amoco only the week before the hearing on the instant matter that the information provided EPA to assess whether contamination at the Refinery posed a current threat to health or the envi-

---

**3.** The 1996 Final Administrative Order encompassed both the Refinery proper and Soda Lake.

ronment or required the implementation of immediate interim measures was inadequate.

### (ii) The Tank Farm

The Tank Farm is further along in the RCRA process than the Refinery. The EPA exercised its RCRA jurisdiction at the Tank Farm in 1988 to permit Amoco to operate land treatment units at the Tank Farm and to require Amoco to conduct a RCRA Facility Investigation. *See* Vol. IV, p. 115. That Investigation was initiated in 1989 and concluded in 1994. The resulting Investigative Report provided by Amoco asserted with two exceptions that any contamination at the Tank Farm posed no threat to the public water system, to private drinking wells, to the air in Casper, or to the Casper community in general. *See* Pls.Ex. 4, Review, p. 1; Vol. IV, pp. 116–18.

As at the Refinery, the EPA's 1997 review and comment of the Tank Farm Investigation characterized portions of the Report as "inadequate to support an assessment of potential risks to ecological receptors." Pls.Ex. 4, Review, p. 1. On September 4, 1997, the EPA requested Amoco to provide within 30 days additional work plans and information sufficient to quantify any risks, including those posed by asbestos, to health or the environment from the numerous contaminants potentially present at the Tank Farm. *Id.;* Vol. IV, p. 121.

### (iii) Off-site Areas

In addition to the Refinery and Tank Farm, there are several off-site areas Amoco is investigating in coordination with the WDEQ. These off-site areas are denominated Areas A, B, C, D, E, and F. Investigation of the off-site areas is divided among two environmental consulting firms. TriTechnics Corporation is conducting the investigation of Areas A, B, and E; Morrison Knudsen Corporation is presiding over the investigation at Areas C, D, and F. The purpose of these off-site investigations is to evaluate the nature and extent of any contamination and to "propose and implement interim measures and long-term corrective action at these areas as appropriate." Vol. III, p. 172.

Areas A and B are south of the River and directly east of the Refinery; Area A includes the property of Plaintiffs Richard and Eleanor Wilson. Areas C, D, E, and F are all north of the River and in close proximity to the Tank Farm. Area C is between the River's north bank and the Tank Farm property line. Area D is west of the Tank Farm; it includes the Black Hills Bentonite area referred to above. *See* Vol. IV, p. 131. Area F is east of the Tank Farm, and Area E is directly east of Area F. *See* Attachment 1.

On March 12, 1997, Amoco submitted to the WDEQ the "Off–Site Areas A & B Investigation Report (Report)" and the accompanying "Work Plan," both of which were prepared by TriTechnics. *See* Amoco Ex. S. The Report acknowledged that a plume of petroleum and benzene had migrated beyond the Refinery grounds into Areas A and B, but concluded that other contaminants either were not present or were insufficient in quantity to constitute a threat. *Id.* at 7–1 to 7–7. The Report did, however, recommend that additional monitoring be undertaken and an additional barrier well installed. *Id.* at 7–7.

In its May 13, 1997, response the WDEQ advised Amoco it had found "many errors" in the raw data that rendered "the figures unreliable and most of the conclusions invalid." Two aspects of the Report were particularly troubling. First was the inaccurate reporting of data. For example, the benzene value reported to WDEQ for one monitoring well was 88 micrograms per liter, although the benzene value at the well was reported by the sampling lab as 8800 micrograms per liter. At another well the benzene value was reported to WDEQ as 110 micrograms per liter, but again was reported by the lab as being 11,000 micrograms per liter. Second, the investigation failed to address the presence of DNAPLs in Areas A and B. *Id.* Given these and other obvious deficiencies in the Report, WDEQ warned Amoco that until corrections were made, "the proposed additional investigations and conclusions reached in these two documents are premature." Pls. Ex. 3, p. 1.

Mark Degner, the Senior Project Manager for TriTechnics, represented to the Court at

the hearing on this matter that subsequent meetings had resolved the WDEQ's concerns, and that a plan for DNAPL testing is in the works and should be completed soon. *See* Vol. III, p. 212. Mr. Degner expected bedrock mapping to then take place and well installation (to bedrock) to occur at Areas A and B "early in the spring" of 1998. *Id.*

As noted, Morrison Knudsen (MK) is investigating off-site areas C, D, and F. The MK investigation of Area D, completed in 1996, found substances containing hazardous constituents. *See* Amoco Ex. D1. However, MK reported finding no evidence that these substances were impacting the River as well as no evidence of air or asbestos contamination in Area D. *See* Vol. IV, pp. 132–33.

MK also has completed work plans to investigate areas C and F. Those plans have been approved by the WDEQ and currently are under review by the EPA. *Id.* at 132. Assuming approval, MK expects to conduct the investigations of Areas C and F in the spring once the ground has thawed. *Id.*

### c. The Amoco Service Station

From the mid–1960s until 1991, Amoco owned and operated a service station in Casper. The station was located northeast of the Refinery, north-northwest of the Burlington Northern and Steiner facilities, and directly south of Interstate 25. *See* Attachment 1. According to Plaintiffs, petroleum products and substances containing hazardous and toxic substances or constituents that were used or generated in the operation of the service station have contaminated the soil and groundwater in the vicinity and downgradient of the station property. *See* Amended Complaint ¶ 43. Testing has confirmed the presence of numerous contaminants, including hydrocarbons and BTEX,[4] in those soils and groundwater. *See* Amoco Ex. A, p. 22; Vol. III, p. 196.

There has been some agency involvement at the former service station site. When operations began in the mid–1960s, the station was equipped with four 4,000 gallon tanks. At some point those tanks were removed and replaced with three 10,000 gallon steel tanks, and one 550 gallon steel underground storage tank. *See* Amoco Ex. R, p. 2. In 1992, the WDEQ removed all four of these newer tanks as well as 917 tons of contaminated soil. *Id.* Although no holes were found in the four tanks, an inflow of groundwater exhibiting a "petroleum hydrocarbon sheen" was encountered during the excavation. *See* Amoco Ex. G4, p. 1. The condition of the original four tanks at the time of their removal is undocumented.

At present, WDEQ retains jurisdiction over the site. It appears, however, from a 1992 WDEQ letter to Amoco that the cleanup costs of the hydrocarbon contamination at the station will be borne by a State of Wyoming fund supported by tank registration fees and fuel taxes. *See id.* That fund pays for necessary corrective action at sites contaminated by releases from underground storage tanks. *See* W.S. §§ 35–11–1414—35–11–1428. The State maintains a priority list ranking—based on the magnitude of the expected cleanup and the threat posed by the contamination at the particular site—of sites requiring investigation or cleanup. *See id.* § 35–11–1424(b) & (c). There is some evidence that the fund-sponsored investigation of the contamination at the former Amoco station and several stations in the area is now underway. *See* Amoco Ex. A, p. 23.

### 2. Burlington Northern

Since 1917, Burlington Northern (BN) has operated a rail yard in downtown Casper. The yard was developed to serve as a depot and locomotive fueling and maintenance facility for steam engines. *See* Pls. Ex. 118, p. 1. Historically, the yard has contained a roundhouse, an above ground diesel storage tank, a depot, a freighthouse, and a fueling track (which itself included a track pan and collection system, a grit chamber, and a large waste oil underground storage tank). The site also included "several bulk oil storage facilities, some light industries, and other

---

**4.** BTEX is an acronym for benzene, toluene, ethylbenzene, and xylene. "BTEX compounds are major components of gasoline and minor components of other petroleum fuels, and commonly contaminate soil and groundwater because of fuel spills and leaks." Steiner Ex. C, p. 71.

warehousing facilities." *Id.* Over the years, the roundhouse and all the tanks have been removed. *Id.* Historical fueling operations at the yard were discontinued in 1981. *See* Vol. V, p. 245.

Testing has confirmed that diesel and oil contamination is present at the BN facility and that a substantial plume of perchloroethylene, or PCE,[5] extends across the BN property. *See* BN Ex. V. According to BN, the only contamination at the yard for which it bears responsibility is the pool of diesel—which is not a hazardous waste as defined by RCRA—that has infected the groundwater. *See* Pls. Ex. 118, p. 2. BN asserts the PCE plume originated from foreign sources upgradient of the yard.

Agency involvement at the site has been limited, but gradually intensifying. In the last decade, the WDEQ has supervised the removal of the underground tanks, and has since monitored and commented on BN's investigation of the diesel pool at the yard. It appears the WDEQ and BN are presently proceeding via a good-faith, voluntary "conference and conciliation" procedure rather than a formal regulatory process. *See, e.g.,* BN Ex. Q–20.

In March 1996, BN hired Environmental Resources Management (ERM) to define the nature and extent of the contamination on the BN property and if necessary design an appropriate corrective measure. *See* BN Ex. V, p. 2. ERM reported that: the diesel free product pool is not migrating; BN is not a contributor to the PCE plume; petroleum hydrocarbons are present at low concentrations; chloroform is not a site contaminant of concern; and testing for DNAPLs would be

an unnecessary exercise. *Id.* at 4–8; Vol. V, p. 241.

ERM has conceived a "conceptual plan for remediation," which proposes that skimmer wells be employed to recover the free product floating on the groundwater. Vol. V, p. 253. At the hearing, Ted Borer, an ERM chemical and environmental engineer, indicated WDEQ had verbally approved the plan and estimated the skimmer wells would be in place within three months of WDEQ's formal approval. *Id.* at 255–58.

### 3. Steiner

In 1972, Steiner purchased a dry cleaning facility in Casper from Troy Laundry, which had provided dry cleaning services on the property since the 1920s. *See* Aff. of Kevin K. Steiner, ¶ 2. From the time of purchase until 1987, Steiner engaged in industrial laundry and dry cleaning services on the premises. *Id.* at ¶¶ 2, 5. Steiner sold the property in 1994. *Id.* at ¶ 8.

The Steiner facility was located northeast of the Amoco Refinery and south of the BN yard in central Casper. *See* Attachment 1. It is undisputed that a significant PCE plume exists that originates in the vicinity of the former Steiner facility and extends underneath the BN yard and eventually to the North Platte River.[6] *See* Steiner Ex. D–1. Past sampling of the groundwater associated with the plume has revealed PCE concentrations in excess of established maximum contaminant levels (MCLs). *See* Steiner Ex. E, p. 27; Pls. Ex. 122. The Steiner plume and the Norge PCE plume to its west collectively discharge 63,000 to 230,000 gallons per day of PCE infected groundwater into the North Platte River. *See* Steiner Ex. E, p. 28. The

---

**5.** PCE is an organic chemical that is not only an ingredient in many chemicals but is also used extensively both to dry clean clothing and remove grease from metal equipment. *See* BN Ex. D–22, p. 2. PCE is very dense and sinks in water; as a DNAPL, it tends to be found at the bottom of the groundwater on the top of bedrock. *Id.* Although PCE has not been shown to cause cancer in humans, it has been shown to cause cancerous tumors in rats and mice exposed to extremely high PCE dosages. *Id.* at 4. The only way to completely remove PCE is to excavate the soil down to the bedrock and destroy the PCE by burning the soil in an incinerator. *Id.* at 11.

**6.** There are in fact two PCE plumes in the vicinity; the one referred to and described above that extends under the Steiner property and across downtown Casper, and a second plume to the west, described as the Norge plume. The Court will refer to the plume extending beneath the Steiner property as the Steiner plume. The Court intimates that it uses this term as a labeling tool for convenience purposes only, and does not by that use imply Steiner is solely responsible for the contamination.

specific proportion contributed by either plume has not been determined.

There is evidence of Steiner contributions to the PCE contamination. Janith Coe, a former production manager at the Steiner facility, recalled an older dry cleaning machine discharging PCE through a hose and into a floor drain connected to the sewer system. *See* Aff. of Janith Coe. According to Coe, there also were PCE spills both inside the building in the dry cleaning department and outside the building at the Steiner PCE storage tank. *Id.* The spills inside the building were occasionally remedied by sweeping the PCE through the facility doors into the parking lot. *Id.;* Vol. III, p. 47.

Dennis McHattie, former plant engineer at the site, recalled cleaning the "button trap," a component of the dry cleaning machine through which PCE flowed, by hosing it off into troughs that flowed into the sewer system. *See* Aff. of Dennis McHattie; Vol. III, pp. 40–41. Maintenance of the water separator, another component of the dry cleaning machine, also resulted in PCE infected water being dumped into those same drain troughs. *See* Aff. of Dennis McHattie; Vol. III, p. 42.

Despite the recollections of Coe and McHattie, and the conclusion of at least one study identifying Steiner as a potential contributing source, Steiner contends it is not responsible for any of the PCE contamination. *See* Steiner Ex. E, p. 28; Vol. I, p. 71. Consistent with this stance, Steiner has made no effort to investigate or remediate the plume of PCE contaminants associated with the former Steiner facility. There likewise has been no federal or state agency involvement directed towards investigating or remediating the PCE contamination. In fact, WDEQ publicized in its September 1997 fact and issues sheet that no further sampling or investigation is contemplated at the site. *See* BN Ex. D–37, p. 2.

### *Jurisdiction and Standards*

### 1. Jurisdiction

The Court has jurisdiction over Plaintiffs' RCRA claim pursuant to 42 U.S.C. § 6972 and over Plaintiffs' CWA claim pursuant to 33 U.S.C. § 1365. Notwithstanding these statutory jurisdictional bases, Defendants invite the Court to invoke the doctrine of primary jurisdiction and decline to hear the case.

The doctrine of primary jurisdiction is a prudential common-law concept applied when resolution of a particular claim requires consideration of facts or issues deemed to be within the special competence of an administrative agency. *See Sierra Club v. United States Dept. of Energy,* 734 F.Supp. 946, 950 (D.Colo.1990). In articulating and refining the doctrine, the Supreme Court has cautioned that "in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over." *Far East Conference v. United States,* 342 U.S. 570, 574, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952). The doctrine is designed not only to encourage courts to defer to agency expertise when appropriate, but to "promote proper relationships between the courts and administrative agencies charged with particular regulatory duties." *United States v. Western Pacific R.R. Co.,* 352 U.S. 59, 63, 77 S.Ct. 161, 164–65, 1 L.Ed.2d 126 (1956).

The doctrine, however, does not mandate blind deference in all circumstances involving issues of agency expertise. *See Sierra Club,* 734 F.Supp. at 950. It instead is a malleable concept requiring application only when warranted by the particular facts of the case. Courts have found the following factors helpful in determining the doctrine's applicability: (1) whether the Court is being called on to decide factual issues not within the conventional experience of judges; (2) whether the Defendants could be subjected to conflicting orders of both the Court and the administrative agency; (3) whether relevant agency proceedings have actually been initiated; (4) whether the agency has demonstrated diligence in resolving the issue or has instead allowed the issue to anguish; and (5) whether the Court can fashion the type of relief requested by the plaintiff. *See Friends of Santa Fe County v. LAC Minerals, Inc.,* 892 F.Supp. 1333, 1349–50 (D.N.M. 1995).

Determinations regarding the adequacy of groundwater and contaminant sampling and appropriate remediation techniques are not dealt with by courts on a daily basis. That fact alone, however, is not a sufficient basis for denying jurisdiction. It must be shown that courts in general lack the competence to efficiently and effectively resolve the issue. Other courts have held, and this Court agrees, that questions posed by RCRA and the CWA are not so esoteric or complex as to foreclose their consideration by the judiciary. *See Merry v. Westinghouse Electric Corp.*, 697 F.Supp. 180, 183 (M.D.Pa. 1988). The drafters of the CWA even said so explicitly: "Enforcement of pollution regulations is not a technical matter beyond the competence of the courts." S.Rep. 92–414, 92nd Cong., 2d Sess., reprinted in 1972 U.S.Code Cong. & Admin.News 3668, 3747.

Nor is it a foregone conclusion that any order of this Court will interfere or actually conflict with the orders of the EPA or WDEQ. There is ample documentation of those agencies' institutional attitudes and remediation expectations with respect to Amoco's and BN's facilities to permit this Court to fashion appropriate and non-conflicting relief.[7] Any order of this Court would also not come as a surprise to the agencies, as both the EPA and WDEQ are well-aware of this suit and of the potential for court-ordered remediation. And judging by the testimony of the agency representatives at the preliminary injunction hearing, court ordered relief might even be characterized as welcome.

The likelihood of conflict can be further reduced if the Court considers carefully the agencies' previous and contemplated orders before it orders any relief itself and permits agency comment prior to finalizing any order. The court in *O'Leary v. Moyer's Landfill, Inc.*, 523 F.Supp. 659 (E.D.Pa.1981) implemented a similar approach. In that RCRA and CWA action, the court permanently enjoined the defendants from further discharges and directed them to repair the damaged infrastructure that was causing releases at

their facility. *Id.* at 659. In doing so, the court directed that after preparing a proposed order the parties were to solicit the views of the EPA. One week after solicitation of the agency's views, the parties were to submit the proposed order to the court. The court invited the agency to simultaneously submit memoranda addressing the proposed order. *Id.* Thus, in similar situations courts have fashioned effective non-conflicting injunctive remedies by eliciting the expertise of the involved agencies while maintaining the court's substantial enforcement powers.

There is an additional, overriding reason for courts to hear RCRA and CWA cases despite their supposed unique nature: Congress has told us to. Both RCRA and the CWA explicitly empower citizens to enforce the Acts' provisions except in certain circumstances not present here. This Court could not in good faith unilaterally strip United States citizens of rights given them by their government. *See California Sportfishing Protection Alliance v. City of West Sacramento*, 905 F.Supp. 792, 807 n. 21 (E.D.Cal. 1995) (doctrine of primary jurisdiction "has no application [in a CWA suit] because Congress has expressly set forth the ground rules for citizen suits."); *Craig Lyle Limited Partnership v. Land O'Lakes, Inc.*, 877 F.Supp. 476, 483 (D.Minn.1995); *Merry*, 697 F.Supp. at 182.

In short, Defendants would have this Court wield the tool of primary jurisdiction to surrender its statutorily imposed duty to entertain and decide this action. Such an application of that doctrine would do injustice to the equally long-standing principal that Courts of the United States "have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the Constitution." *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 403, 5 L.Ed. 257 (1821). The Court will not invoke the doctrine of primary jurisdiction.

## 2. Preliminary Injunction Standard

Plaintiffs and Defendants are in sharp disagreement as to the appropriate standard

---

7. The Court need not be concerned with interfering with any agency order with respect to Steiner

as there is no agency involvement at that site.

the Court should apply to determine if Plaintiffs' requested injunction is warranted. Plaintiffs argue the traditional equitable factors requiring a showing of irreparable injury before an injunction may issue are not applicable in situations involving the environment or public health. Defendants, in turn, urge the Court not to depart from the traditional analysis merely because the case presents unique facts and pressing matters of public concern.

A court passing judgment on a motion for preliminary injunction traditionally has considered the following four equitable factors: (1) whether the plaintiffs have shown a substantial likelihood of success on the merits; (2) whether the plaintiffs will suffer irreparable injury unless the injunction issues; (3) whether the threatened injury to the plaintiffs outweighs whatever damage the injunction may cause the defendants; and (4) whether the injunction would be adverse to the public interest. *See SCFC ILC, Inc. v. Visa USA, Inc.,* 936 F.2d 1096, 1098 (10th Cir.1991).

Most preliminary injunctions sought are prohibitory; that is, they preserve the status quo pending a trial on the merits. Injunctions that disturb the status quo, by requiring some positive act, are denominated mandatory injunctions. Because mandatory injunctions are more burdensome than prohibitory injunctions they require plaintiffs to demonstrate entitlement to the injunction by heavy and compelling evidence. *See id.* at 1099. This heightened evidentiary burden also must be met where the issuance of the injunction would provide the plaintiffs with substantially all the relief that would be available to them following success on the merits. *See Phillip v. Fairfield Univ.,* 118 F.3d 131, 133 (2d Cir.1997).

Plaintiffs' contention that these traditional equitable principles do not apply, and that Plaintiffs do not have to make some showing of irreparable harm, is unsupported by authority. The Supreme Court advised in *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982), that in the absence of express Congressional intent to the contrary a plaintiff seeking injunctive relief—even under an environmental or public health statute—still must demonstrate irreparable harm and inadequacy of legal remedies. *See also Ayers v. Espy,* 873 F.Supp. 455, 470 (D.Colo.1994). That said, Defendants are equally incorrect in rigidly contending that no adjustments to the traditional analysis are warranted in these circumstances. There is substantial authority that when a case is brought pursuant to an environmental or public health statute, including RCRA and the CWA, the primary focus shifts from irreparable harm to concern for the general public interest. *See United States v. Bethlehem Steel Corp.,* 38 F.3d 862, 868 (7th Cir.1993); *United States Environmental Protection Agency v. Environmental Waste Control, Inc.,* 917 F.2d 327, 332 (7th Cir.1990); *Buchholz v. Dayton International Airport,* 1995 WL 811897 (S.D.Ohio 1995); *see also United States v. Marine Shale Processors,* 81 F.3d 1329, 1359 (5th Cir.1996) (noting "extraordinary weight courts of equity place upon the public interests in a suit involving more than a mere private dispute"). Thus, although it is not appropriate to dispense with the required showing of irreparable harm, it is permissible as part of the traditional balancing process to lessen the weight attributable to that usually dispositive factor.

In sum, the Court will apply the traditional equitable factors and require Plaintiffs to demonstrate there is a substantial likelihood they will succeed on the merits; they will suffer irreparable injury if the injunction does not issue; the potential injury to them is greater than any potential damage caused Defendants by issuance of the injunction; and that the issuance of an injunction is in the public's best interest. In balancing these factors, the Court will weigh heavily the general public's interest in the issuance of the injunction. Because Plaintiffs seek a mandatory injunction, however, they bear the burden of showing that on balance the four factors weigh compellingly in their favor.

### 3. Resource Conservation and Recovery Act (RCRA)

The Resource Conservation and Recovery Act, or RCRA, is a comprehensive environmental statute designed to ensure that solid

**1172**

and hazardous wastes are not disposed of in manners harmful to the public health or the environment. *See* 42 U.S.C. § 6902(a). To accomplish these lofty objectives, the Act regulates the generation, handling, treatment, storage, transportation, and disposal of solid and hazardous wastes. *See* 42 U.S.C. §§ 6922 – 25. This far-reaching regulation is frequently described as "cradle to grave" oversight. *See Sierra Club v. United States Dept. of Energy,* 770 F.Supp. 578, 579 (D.Colo.1991).

In an effort to secure enforcement of the Act's provisions to the fullest extent possible, Congress conferred enforcement power not only on the EPA or a duly authorized state agency, but also in certain circumstances on affected United States citizens themselves. RCRA's citizen suit provision provides in relevant part as follows:

[A]ny person may commence a civil action on his own behalf—

(B) against any person, including the United States and any other governmental instrumentality or agency, ... including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

42 U.S.C. § 6972(a)(1)(B). Thus, any affected citizen may bring suit against any of the above individuals or entities whose waste-related acts or omissions present an imminent and substantial endangerment to health or the environment.

 As the plain language of § 6972(a) specifies, it is not necessary that Plaintiffs show the contamination is damaging, or will damage, health or the environment. It is enough to show that such an endangerment "may" exist. In other words, Plaintiffs need not show actual harm to health or the environment, only threatened harm. *See Dague v. City of Burlington,* 935 F.2d 1343, 1355 (2d Cir.1991), *rev'd on other grounds,* 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992);

*United States v. Price,* 688 F.2d 204, 211 (3d Cir.1982). This expansive language is indicative of Congress's intent "to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate any risk posed by toxic wastes." *See Dague,* 935 F.2d at 1355.

 Notwithstanding the wide-ranging categories of threats encompassed by RCRA's citizen suit provision, the Court should be cautious when considering preliminary injunctive relief, and will not find that an imminent and substantial endangerment exists if the risk of harm is remote in time, speculative in nature, and de minimis in degree. *See United States v. Reilly Tar & Chemical Corp.,* 546 F.Supp. 1100, 1109 (D.Minn.1982). If, however, the Court finds an imminent and substantial endangerment exists, it has broad equitable powers, and may, "without regard to the amount in controversy or the citizenship of the parties, ... restrain any person who has contributed to the past or present handling, storage, treatment, transportation, or disposal of the solid or hazardous waste" presenting the threat to health or the environment. *See* 42 U.S.C. § 6972(a). Both prohibitory and mandatory injunctions may properly be issued under this provision. *See Meghrig v. KFC Western, Inc.,* 516 U.S. 479, 483–84, 116 S.Ct. 1251, 1254, 134 L.Ed.2d 121 (1996).

**4. Clean Water Act (CWA)**

Congress passed the Clean Water Act in 1972 to "maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The objective of the CWA is not simply to limit the amount of pollutants discharged into navigable waters, but to eliminate such discharges altogether. *See* 33 U.S.C. § 1251(a)(1). The Act therefore categorically prohibits any person from discharging pollutants from a point source into the navigable waters of the United States without a permit. *See* 33 U.S.C. § 1311(a); *see also Committee to Save Mokelumne River v. East Bay Mun. Utility Dist.,* 13 F.3d 305, 309 (9th Cir.1993).

 As with RCRA, Congress saw fit to permit affected citizens to bring suit to en-

force certain provisions of the CWA. The CWA's citizen suit provision provides in relevant part as follows:

[A]ny citizen may commence a civil action on his own behalf—

(1) against any person ... who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation....

33 U.S.C. § 1365(a). If the Court finds a person in violation of the CWA, it may order any relief it considers necessary to secure prompt compliance with the Act. *See Romero–Barcelo*, 456 U.S. at 320, 102 S.Ct. at 1807.

In recent years, and in this case, there has been much debate about when a person is "in violation" of the CWA. The controversy originated in 1987 when the Supreme Court in *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987), held that the CWA's citizen suit provision did not permit private actions based on "wholly past [CWA] violations." The Court reasoned that the most natural reading of the phrase "to be in violation" requires that "citizen-plaintiffs allege a state of either continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future." *Id.* at 57, 108 S.Ct. at 381.

Although *Gwaltney* settled that "wholly past" violations are not cognizable under the CWA's citizen suit provision, it offered little explanation as to when a violation ceases to be ongoing and becomes "wholly past." Authorities are split on the issue. Some courts have adopted an expansive interpretation and held that an ongoing violation exists until the risk of continued violation has been completely eradicated. *See, e.g., Sierra Club v. Union Oil Co.*, 853 F.2d 667, 671 (9th Cir.1988). Two courts have employed this language in concluding that a violation is ongoing when a pollutant previously added to groundwater continues to reach a navigable water via groundwater migration. *See Umatilla Waterquality Protective Ass'n v. Smith Frozen Foods, Inc.*, 962 F.Supp. 1312, 1322 (D.Or.

1997); *Werlein v. United States*, 746 F.Supp. 887, 896–97 (D.Minn.1990), *vacated in part on other grounds*, 793 F.Supp. 898 (1992).

Other courts have not been so generous, and have held both pre- and post–*Gwaltney* that "continuing residual effects resulting from a discharge are not equivalent to a continuing discharge." *Hamker v. Diamond Shamrock Chemical Co.*, 756 F.2d 392, 397 (5th Cir.1985); *see Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co., Inc.*, 989 F.2d 1305, 1313 (2d Cir.1993) ("The present violation requirement of the [CWA] would be completely undermined if a violation included the mere decomposition of pollutants."); *Brewer v. Ravan*, 680 F.Supp. 1176, 1183 (M.D.Tenn.1988). In addition, a district court in this Circuit has only recently held that "migration of residual contamination resulting from previous releases is not an ongoing discharge within the meaning of the [CWA]." *LAC Minerals, Inc.*, 892 F.Supp. at 1354.

Here, as Defendants note, there are no ongoing operations at the Amoco and Steiner facilities, and Plaintiffs have not charged that any of BN's current operations are resulting in new discharges of contaminants into the groundwater. Thus, with a few exceptions as to Amoco, the alleged ongoing violation with respect to all three defendants is the continuing migration of the contaminated groundwater to the North Platte River. Given the split of authority as to whether such ongoing migration constitutes a CWA violation, and the lack of briefing to the Court on the matter, the Court will not consider the CWA claim in the instant motion but will proceed solely under RCRA. This ruling will have little, if any, practical impact on any relief ordered by the Court, as any violation of the CWA sufficient to warrant granting preliminary injunctive relief would almost certainly constitute an imminent and substantial endangerment to health or the environment under RCRA.

### *Analysis*

**1. Amoco: Refinery and Tank Farm**

**A. Likelihood of Success on the Merits**

Were Plaintiffs seeking a prohibitory rather than mandatory injunction, they

would need only to "raise questions going to the merits so serious, substantial, difficult, and doubtful, as to make them a fair ground for litigation, and thus for more deliberate investigation." *See Zurn Constructors, Inc. v. B.F. Goodrich Co.,* 685 F.Supp. 1172, 1180 (D.Kan.1988). Because they seek a mandatory injunction, however, Plaintiffs must show in a compelling fashion that they eventually will prevail on the merits. *See George Washington Home Owners Ass'ns v. Widnall,* 863 F.Supp. 1423, 1426 (D.Colo.1994).

■ In order to prevail on the merits, Plaintiffs must establish that: (1) conditions at the site may present an imminent and substantial endangerment to the environment; (2) the endangerment stems from a solid or hazardous waste as defined by RCRA; and (3) the defendant has contributed to or is contributing to the handling, storage, treatment, transportation, or disposal of such waste. *Foster v. United States,* 922 F.Supp. 642, 660 (D.D.C.1996); *United States v. Bliss,* 667 F.Supp. 1298, 1313 (E.D.Mo.1987).

Amoco does not dispute with any force either that the contamination underneath or migrating from the Amoco Refinery and Tank Farm consists of regulated wastes as defined by RCRA, or that it has contributed to the handling, storage, treatment, or disposal of those wastes. Thus, the sole issue for determination with respect to the success on merits factor is whether there is an imminent and substantial endangerment to the environment.

■ An imminent and substantial endangerment will be found to exist if there is "reasonable cause for concern that someone or something may be exposed to a risk of harm if remedial action is not taken." *Foster,* 922 F.Supp. at 661. Although this definition certainly encompasses emergency-type situations, it is not limited in application to such a narrow set of circumstances. *See United States v. Waste Industries, Inc.,* 734 F.2d 159, 165 (4th Cir.1984). Instead, a finding of imminent and substantial endangerment is permissible if the conditions giving rise to the threat are currently present, even though the impact of the threatened harm may not be realized, if ever, for many years.

*See Price v. United States Navy,* 39 F.3d 1011, 1019 (9th Cir.1994). "An imminent hazard may be declared at any point in a chain of events which may ultimately result in harm to the public" or the environment. *Craig Lyle Limited Partnership,* 877 F.Supp. at 482.

As referenced previously, on November 4, 1997, the EPA's remedial project manager for hazardous waste at the Amoco facility, Felix Flechas, wrote a lengthy letter to Amoco informing it of the numerous and serious deficiencies in the Refinery CCRA Report. *See* Pls. Ex. 2. That letter informed Amoco of the EPA's comparison of information provided the EPA by Amoco in the CCRA with the information contained in depositions on the instant matter and the EPA's resulting determination that "Amoco has not presented all information in the CCRA of which it should clearly have been aware." *Id.,* Letter, p. 2. Particularly alarming to the EPA was Amoco's "failure to mention the extensive use, apparent mismanagement, and on-site disposal of asbestos during the life of the [Refinery]." *Id.* at 3. Other information notably absent from the CCRA report was the potentially ubiquitous presence of "carcinogenic organic compounds, sulfuric acids, and metal contaminated soils throughout the [Refinery]." *Id.*

The EPA further informed Amoco that groundwater releases at the facility are uncontrolled and stated that groundwater "information in the CCRA alone shows conclusively that Amoco's modeling results are not accurately presenting groundwater flow through and from the [Refinery]." *Id.* at 4. The EPA characterized Amoco's source control efforts as follows:

> Major sources of hazardous waste and/or hazardous constituents are located at the [Refinery] and have not been identified in the CCRA, and, though, as described in the Depositions are apparently of great concern, are not being addressed. Further, the CCRA does not indicate that Amoco is making any significant effort to prevent releases to the environment for many, if not all of these sources, or to abate releases, or ongoing migration, from

highly contaminated areas. It is not adequate for source control purposes to merely keep continuing releases and/or migration of contamination onsite. Further, and perhaps most importantly, Amoco has not presented adequate information to support its argument that contamination is being kept onsite.

*Id.* at 4–5. Given the plethora of threats present at the Refinery, it was the EPA's opinion that "[w]ithout implementation of additional measures, this site is not stabilized and is potentially exposing receptors to risks from [Refinery] contaminants." *Id.* at 5. The EPA further advised Amoco that its "lack of full assessment of known or potential releases of hazardous waste and/or hazardous constituents in itself presents a risk to human health and the environment...." *Id.* at 3.

At the hearing on this matter, Flechas elaborated on the conditions at the Refinery. He noted the four factors examined by the EPA to determine site stability: threats to human health, threats to ecological systems, threats of continuing releases, and threats of off-site releases. *See* Vol. V, p. 12; Pls. Ex. 2, Letter, p. 3. It was Flechas's opinion that the Amoco Refinery "may be out of control on all four of the environmental indicators." Vol. V, p. 14.

Compelling evidence confirms the EPA's suspicions with respect to the Refinery, and indicates further that contamination potentially posing a serious threat is present at the Tank Farm as well. At the Refinery, testing has indicated levels of lead contamination in excess of health-based residential land use standards; soil concentrations of antimony, benzoapyrene, polynuclear aromatic hydrocarbons, and mercury in excess of residential soil ingestion concentration standards; high concentrations of benzene; and the presence of sulfuric acid. *See* Pls. Ex. 2, Letter, p. 5; Review, p. 9 ¶¶ a & b; p. 10 ¶ c; p. 11 ¶ f; p. 12 ¶ h; p. 14 ¶ j; p. 16 ¶¶ o & p; p. 17 ¶ q; *see also* Vol. II, pp. 117–22. It also is highly probable that contamination remains in and continues to emanate from the extensive but vastly deteriorated piping underneath the Refinery. *See, e.g.,* Vol. II, pp. 79, 181, 185; Pls. Ex. 125. Testing at the Tank Farm has

confirmed the presence of mercury, antimony, and benzene in excess of maximum contaminant levels, and the presence of chloroform. *See* Pls. Ex. 4, pp. 14–15 ¶ 19; p. 28 ¶ 57. All of these substances are known or suspected carcinogens. At both the Refinery and Tank Farm, there appears to be widespread asbestos contamination. *See, e.g.,* Vol. II, pp. 88, 215; Pls. Ex. 2, Letter, p. 4.

In spite of this evidence, Amoco directs the Court's attention to the parade of Amoco witnesses who testified at the preliminary injunction hearing that the existence or potential for existence of any of these threats poses no possible danger to health or the environment. The testimony of these witnesses can be categorically restated as follows: (1) the barrier well system is effective and prevents migration of contaminated groundwater from impacting off-site properties and the River; (2) there is no threat posed by the asbestos contamination; and (3) there are no human or ecological receptors that potentially could be affected by the contamination. *See* Amoco Exs. A, C, F; Aff. of Mark Degner; Aff. of Jenny Phillips. The Court will consider these arguments in turn.

The barrier well system was designed to collect hydrocarbon contamination from the groundwater. Since its installation approximately 25 years ago the system has recovered 250,000 barrels of contamination from beneath the Refinery. In theory, the system's overlapping cones of depression and utilization of multiple wells would capture all LNAPL contamination migrating to the River and off-site. Historically, however, its utility has been limited in that groundwater contamination has bypassed the system and impacted the River and off-site properties. *See, e.g.,* Pls. Ex. 303; Vol. II, p. 199. For several years the entire system (all the wells) was inoperable 20–25% of the time; the extent to which individual wells within the system were not functioning is not even documented, as the system was only considered "down" when none of the wells were operational. *See* Vol. II, pp. 76, 157–60, 173. On occasion, biological growth would plug and clog the well screens, further limiting the system's effectiveness. *Id.* at 159.

Even accepting as true Amoco's argument that breakdowns presently are extremely rare, there is significant evidence that contamination continues to elude capture by the wells. As stated by the EPA in its November 4 letter, Amoco is not controlling groundwater releases at the Refinery, and lacks sufficient information to conclude, as Amoco has done, that such releases are not affecting the River and properties south and east of the Refinery. *See* Pls. Ex. 2, Letter, p. 4. Similarly, the WDEQ has informed Amoco that the submitted data and information do not support a conclusion that the barrier well system effectively prevents off-site migration of hydrocarbon. *See* Pls. Ex. 3, p. 2.

The ineffectiveness of the well system is in part attributable to the fact that the wells were not drilled to bedrock. *See* Pls. Ex. 2, Letter, p. 7. Consequently, heavier contaminants, such as DNAPLs, or even lighter contaminants that have collected in sediments beneath the water table, do not respond to the well's hydraulic forces, but sink and either pass underneath the wells or collect along the bedrock and become a perpetual contamination source. *See id.;* Vol. V, pp. 23–28.

In short, it is not satisfactory, as implied by Amoco's arguments, that the system extracts some, or even most, of the contamination migrating to the River if significant amounts of contamination nonetheless bypass the system. The River is affected in either event and the difference is one only of degree.

Amoco's argument with respect to any threat posed by asbestos is equally baseless. Although Amoco points to test results indicating that no asbestos is being blown off-site from the Refinery, that test was woefully inadequate to support Amoco's sweeping conclusion. Only five monitors were placed at the perimeter of the 500 acre Refinery; some of these monitors were upwind of the site. *See* Vol. III, p. 189; Aff. of Mark Degner. In addition, despite some asbestos sampling and even some asbestos removal at the Tank Farm, *see* Amoco Ex. Z4, there has not been soil sampling at either the Refinery or the Tank Farm in which the soil was penetrated to a satisfactory depth and samples were taken from predetermined centers of equal distance throughout the site.

Finally, the Court rejects Amoco's argument that the contamination poses no threat to human or ecological receptors. As noted above, the widespread asbestos contamination presents a potential threat to human health, particularly if asbestos on the soils is being blown off-site and impacting non-Amoco properties. Other threats to human health, as documented by the EPA, are the "potential ubiquitous presence of carcinogenic organic compounds, sulfuric acid, and metal contaminated soils...." Pls. Ex. 2, Letter, p. 4.

The risk of harm to ecological receptors is even greater. The U.S. Fish and Wildlife Service has indicated to EPA that the River may be seriously impacted by contamination from the Refinery and that the contamination at Soda Lake has been characterized as sufficient to impair aquatic bird reproduction. *Id.; see* Vol. V, pp. 45–49. In addition, groundwater otherwise suitable and in the past actually used for drinking has been and continues to be threatened by Amoco's contamination. If left unabated, migration of the contamination may impact what is currently uncontaminated, pristine groundwater. That threat alone is a sufficient basis for the issuance of an injunction. *See United States v. Valentine,* 856 F.Supp. 621, 626 (D.Wyo. 1994); *Buchholz,* 1995 WL 811897, at *24; *Lincoln Properties Ltd. v. Higgins,* 1993 WL 217429, *13 (E.D.Cal.1993). Although Amoco notes there is little, if any, evidence that the groundwater is presently used for drinking purposes, that argument is relevant only with respect to threats to human receptors and ignores the position taken by the State of Wyoming that all groundwater in the State is important and should be protected for future consumptive uses. *See* Pls. Ex. 4, p. 6.

There are additional reasons to view the testimony of Amoco's witnesses with particular caution: many of them were involved heavily in preparing the reports found inadequate and lacking by the EPA and WDEQ; others, though not involved in the preparation of those reports, relied to some extent on the inadequate date and unsupported conclusions reached therein. *See, e.g.,* Amoco

Ex. a, p. 15; Ex. C., p. 6; Ex. F, pp. 10–11. Thus, while the Court has heard and reviewed these witnesses' testimony, it simply finds their plenary statements as to the threat of harm to be not entirely credible.

■ In short, the Court finds that the contamination at the Refinery and Tank Farm and its continuing migration and impact on the North Platte River and off-site properties, and Amoco's resistance to quantification of the risk resulting from that contamination, constitute an imminent and substantial endangerment to health or the environment.

## B. The Likelihood of Irreparable Harm

■ Irreparable harm is not presumed from a violation of RCRA. *See Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 542, 107 S.Ct. 1396, 1402–03, 94 L.Ed.2d 542 (1987). Nonetheless, as the Supreme Court has warned, "environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Id.* at 545, 107 S.Ct. at 1404; *Catron County Bd. of Comm'rs v. United States Fish and Wildlife Serv.*, 75 F.3d 1429, 1440 (10th Cir.1996); *Citizens for Environmental Quality v. United States*, 731 F.Supp. 970, 996 (D.Colo.1989). The irreparable harm standard is not necessarily met by a given quantity of harm; rather, it is met by showing that the quality of the harm is irremediable by a monetary damage award. *See Zurn*, 685 F.Supp. at 1181.

■ If an injunction does not issue there is a substantial likelihood that Plaintiffs will suffer irreparable harm. The contaminated groundwater will continue to elude capture by the partially ineffective barrier well system, and thus continue to impact the North Platte River; the off-site contamination migration will persist unabated; the extent of the apparently ubiquitous asbestos contamination, both on and in the soils, will remain undefined; the risk posed by lead and other metal contamination will not be quantified; and the presence or absence of DNAPLs will

not be determined. The harm posed by these risks—including Amoco's reluctance to quantify to any degree of certainty the environmental threat posed by its contamination—cannot be remedied by an award of monetary damages, but only by pro-active measures directed towards defining and controlling the contamination both on and off the site.

## C. Balancing Injuries

■ This factor requires the Court to balance the competing claims of injury and consider the effect on each party of the granting or withholding of the requested relief. *See Citizens for Environmental Quality*, 731 F.Supp. at 996. For its part, Amoco contends it will suffer significant injury if an injunction issues because it has expended substantial effort and resources in its current investigation. Amoco apparently fears a Court order would require expensive duplication of investigation costs.

Amoco overlooks two facts. First, the EPA has informed Amoco that to date the investigation of the Refinery has been conducted in a haphazard, unmethodical manner and that Amoco therefore will be required to obtain and submit significant amounts of additional information. Hence, Amoco will incur substantial additional investigation expenses even if the Court takes no action. Second, as previously noted, duplication can generally be avoided by consideration of outstanding agency orders and adherence to a process that allows agency comment on any order proposed by the Court. In any event, the extent to which Amoco would be injured by incurring additional expenses is eminently less than the injury that potentially could befall Plaintiffs and the Casper environment if an injunction does not issue.

## D. The Public Interest

■ In considering the issuance of an injunction, the effect on the public of granting or withholding relief merits particular regard. *See Romero–Barcelo*, 456 U.S. at 312, 102 S.Ct. at 1803.

■ There is little doubt here that issuance of an injunction would be in the public's

best interest. Casper citizens have a right to expect contamination-free groundwater and soils, a clean river, and a concerted, honest cleanup effort from a company that benefitted greatly from the community and its surrounding natural resources. Withholding equitable relief in these circumstances would only permit an already present threat to increase in scope and perhaps intensity and further damage the Casper environment.

Amoco argues the public would best be served by allowing the investigative and remediative processes to continue at their present pace. To this end, Amoco asks the Court not to interfere in the cooperative Amoco–EPA/WDEQ relationship and warns that potential "catastrophic environmental hazards" might result from interference with the agency process.

These arguments are unpersuasive and unsupported by the evidence in this case. Indeed, as to Amoco's supposed cooperative relationship with the agencies, the Court finds the tone of the November 4, 1997 EPA and May 13, 1997 WDEQ letters particularly enlightening. Those letters, in conjunction with the hearing testimony, suggest not cooperation but a pervasive corporate attitude of delay, deter, and deceive.

Breuer and Madzy, former Amoco employees whose testimony was referenced earlier, confirm this observation. Breuer opined that Amoco had "strategically omitted" some varieties of solvents from reports, and in some instances, in an effort to limit testing, had failed to fully and adequately characterize the extent of the contamination present. *See* Vol. II, pp. 112, 116. Breuer further recalled it was general company policy not to volunteer unrequested information to agencies, and admitted that both before and after he left Amoco's employ, agency officials had expressed to him that Amoco was stonewalling in an attempt to forestall corrective action. *See id.* at 94, 115.

Both Breuer and Madzy expressed frustration at Amoco's refusal to engage in any corrective activity requiring the expenditure of substantial resources. Breuer remembered specifically that his and other local employees' requests for Amoco to pursue an active, direct cleanup of the site were refused

by the Company. *Id.* at 147. Madzy likewise made numerous requests for cleanup or remediation. *Id.* at 194. One of these requests was to remove the "badly deteriorated" piping underneath the Refinery. *See* Pls. Ex. 125. This, like all of Madzy's requests, was refused; in Madzy's words "it was always money." *See* Vol. II, p. 194.

Amoco's view of a meaningful, productive Amoco—EPA relationship is undoubtedly not shared by the Agency. Flechas described the long delays in the process and the EPA's "history of problems with regard to moving the project along." *See* Vol. V, p. 53. He considers the Amoco—EPA relationship one in which the EPA found itself "in a situation where [it's] constantly having to discuss almost semantics rather than moving ahead with implementing some type of cleanup." *Id.* p. 53.

Amoco's second argument—that court-ordered action would result in environmental hazards—also is without merit for the simple reason that there is no remediation effort underway with which the Court could interfere. In the eight years since regulatory action was initiated at the Refinery and Tank Farm, those sites have reached, respectively, steps 7 and 9 of RCRA's 24 step process. *See* Vol. V, p. 128. At the Tank Farm it took 8 years and over $2,000,000 for the RCRA Facility Investigation Report to be completed and approved; at best, Amoco is in the early stages of preparing such a report for the Refinery. *See* Vol. IV, pp. 147, 152. The only interim or remediative measures of substance taken at the Tank Farm during this period were the placement of a geomembrane, which essentially is a large sheet of plastic held down by hay bales, over an asbestos-contaminated area, and the removal of approximately 2,000 gallons of LNAPL. *Id.* at 125, 148–49. Little, if any, contamination has been removed during this period from any of the Refinery's 37 areas of concern. *See* Vol. II, pp. 100–01.

Equally frustrating are Amoco's insinuations that it somehow is bound or limited in its investigative or remediative efforts by the RCRA process itself. *See* Vol. IV, p. 154 (Amoco "bound by the process"); Vol. V, p.

122 (Amoco a "prisoner of these steps"). Amoco at any time can step outside that process and take independent steps to investigate or remove any of the contamination on its property.

The Court recognizes that some of Amoco's conduct which may in hindsight seem culpable was at the time it occurred in accordance with industry practice and not viewed as particularly malicious. The Court does not fault Amoco for that conduct; it does, however, fault Amoco for its flagrant disavowal of the risk posed by the contamination and its continued delay in taking any substantive institutional initiative to clean up its mess. This demonstrated unwillingness to adhere to the spirit of the applicable environmental regulations and ability to forestall beyond the foreseeable future any substantive remediation efforts warrants at least minimal prodding from this Court.

**E. Appropriate Injunctive Relief**

For the reasons expressed above, the balance of the equitable factors tips heavily and compellingly in favor of the issuance of an injunction. Given that a trial on the merits is but six months away, however, it is unreasonable at this time to issue a plenary order requiring forthwith remediation. Even court ordered remediation cannot be accomplished so quickly. Recent post-hearing EPA decisions requiring Amoco to take additional action at the site also reduce somewhat the necessity for the Court to enter broad investigative and remediative orders. In any event, the Court considers it practicable at this time to order the following investigative, monitoring, and interim measures:

1. With the exception of the RFI, Amoco shall respond to all EPA and WDEQ requests for information, work plans, studies, and corrective action, including interim measures, within 30 days of the EPA request, unless the EPA itself specifies a shorter time period. Amoco shall submit the Refinery RFI to the EPA by May 1, 1998.

2. Amoco shall not seek an extension of *any* EPA- or WDEQ-imposed deadline, including the RFI, without prior approval of this Court. If the Court approves Amoco's request to seek an extension of time, the decision whether to grant such an extension is of course a matter for agency determination.

3. Amoco shall submit to this Court copies of all future EPA/WDEQ and Amoco correspondence related to the site, including, but not limited to, all Amoco work plans, sampling results, and EPA/WDEQ responses to the same.

4. In accordance with the EPA's December 12, 1997 letter and Amoco's December 19, 1997 response, Amoco shall erect an impermeable subsurface barrier, or barrier wall, along the North Platte River and eastern and southern boundaries of the Refinery. As specified, Amoco shall submit a work plan to the EPA for the construction of the barrier wall along the north and east perimeters by January 14, 1998, and for the southern perimeter by February 13, 1998.

5. In accordance with the EPA's December 19, 1997 letter, Amoco shall submit a work plan for comprehensive asbestos testing to the EPA no later than January 20, 1998.

6. Amoco shall prepare and submit to the Court not later than February 2, 1998, a work plan for testing for lead and other metals (the so-called "full suite of metals") throughout the Refinery and Tank Farm sites. At a minimum the tests must provide for core sampling at not more than 50 foot centers throughout the Refinery and Tank Farm; and for a core sampling depth from the ground surface to bedrock. One week prior to submitting the plan to the Court, Amoco shall submit the plan to the EPA and solicit that agency's views on the soundness and extensiveness of the work plan. Those comments should be submitted to the Court along with the work plan. The EPA also may submit its comments on the plan directly to this Court by memoranda.

7. To the extent such action has not been taken, Amoco shall forthwith cover and fence the so-called "eight foot deep football fields of contamination" at the Black Hills Bentonite Acid Sludge Area and the former crude bunker area.

## 2. Amoco Service Station

The Court agrees that there is a host of contaminants underneath the former Amoco service station. Nonetheless, the evidence presented at the hearing was not sufficiently heavy and compelling to attribute that contamination to Amoco or establish that the contamination poses an imminent and substantial endangerment to health or the environment. Indeed, it appears that several former and current service stations upgradient of the Amoco service station may be equally responsible for the hydrocarbon contamination beneath that Amoco facility. *See* Amoco Ex. a, pp. 22–23; Vol. IV, pp. 77–78. Consequently, the Court will deny Plaintiffs' Motion with respect to the former Amoco Service Station.

## 3. Burlington Northern

As noted, the BN property contamination includes, but is not limited to, diesel, hydrocarbons, PCE, and a host of other contaminants. Only the diesel fuel, a non-hazardous waste, has been shown with any certainty to be attributable to BN. The PCE contamination, while undoubtedly disconcerting, appears to originate and be primarily sourced upgradient of the BN yard. Although Plaintiffs did assert at the hearing that solvents and cleaning agents containing PCE were used by BN to clean tank cars, that charge was refuted by ample and credible evidence. *See* BN Ex. SS, p. 2; BN Ex. TT, p. 4; Dep. of Frank Kadlick p. 79. As for the contamination the Court finds attributable to BN, i.e., the diesel fuel, the evidence does not—as it must—"clearly" indicate an existing threat to human health or the environment. *See, e.g.,* BN Ex. V, pp. 3–4, 7; BN Ex. QQ, p. 4.

The Court does not by this ruling suggest BN will prevail on the merits at trial. Indeed, there is some evidence—not overwhelming but at the same time more than a mere scintilla—that BN was in fact a contributing source of the PCE and other contamination at the yard. *See, e.g.,* BN Ex. N–2, pp. 4–5; Pls. Ex. 307, p. 5; Dep. of Lee Chase, pp. 27, 71. Nonetheless, application of the much harsher evidentiary standard imposed on Plaintiffs at the preliminary injunction stage permits the inference only

that BN has released diesel fuel that has impacted the soil and groundwater underneath the BN property. The Court cannot find based on the evidence in the record that any threat posed by the mere presence of a non-hazardous substance such as diesel fuel is sufficiently severe to warrant comprehensive injunctive relief only six months before a trial on the merits.

## 4. Steiner

Plaintiffs face similar causation difficulties with respect to their RCRA claim against Steiner. A 1994 report prepared for the WDEQ by Huntington Engineering and Environmental, Inc., identified 17 potential sources of the PCE contamination attributed by Plaintiffs to Steiner. *See* Steiner Ex. C, p. 18; Steiner Ex. E, pp. 27–29. These sources included Steiner, its predecessor Troy Laundry, Burlington Northern, a landfill, a fuel distributorship, and an auto body shop. *See* Steiner Ex. E, pp. 27–29. Dr. Jeremiah Jackson, an engineer retained by Steiner, identified these same potential sources and a host of others. *See* Steiner Ex. A, pp. 2–3. Given the indetermination as to the degree and extent to which Steiner contributed to the plume, the Court will not at this time enjoin Steiner.

It does not follow from this finding that Steiner is not a potential or even significant source of the PCE contamination. To the contrary, the Coe and McHattie affidavits evidence strongly Steiner's haphazard and consciously inappropriate disposal and handling of PCE infected substances. *See* Aff. of Janith Coe; Aff. of Dennis McHattie; *see also* Pls. Ex. 14. The Court is nonetheless reluctant to prematurely impose on Steiner the considerable burden of investigating and remediating a plume of contamination for which it almost certainly does not bear sole responsibility.

In addition to this myriad of daunting causation hurdles, Plaintiffs face the equally troublesome problem of demonstrating that the PCE contamination poses an imminent and substantial endangerment to health or the environment. The evidence before the Court casts doubts on Plaintiffs' assertion

that it does. The Huntington Report did find a wide range of PCE and BTEX concentrations, including some concentrations in excess of maximum contaminant levels, in the groundwater associated with the Steiner plume. *See* Steiner Ex. C, pp. i; 62; 65–70; 73; 77–79. Huntington concluded in a separate report to WDEQ, however, that the impact of that PCE groundwater contamination on the North Platte River was minuscule and that because of dilution PCE concentrations in the River would theoretically be undetectable. *See* Steiner Ex. E, p. 28. Steiner's expert, Dr. Joyce S. Tsuji, echoed these opinions. *See* Steiner Ex. B, pp. 4–7. This evidence, coupled with the lack of evidence that the PCE contaminated groundwater is being used for drinking purposes, establishes that human and ecological receptors are not presently threatened by the PCE contamination.

Further compelling evidence is provided by the agencies themselves. In a June 1994 environmental fact sheet issued jointly by the EPA and WDEQ, the agencies acknowledged the PCE groundwater contamination, but affirmed PCE had not been found in river samples, had not been positively shown to cause cancer in humans, and had not impacted the Casper drinking water system. That same fact sheet assured Casper citizens it was safe to eat fruits and vegetables watered with PCE impacted groundwater, to water lawns with PCE contaminated groundwater, to allow children to run in sprinklers emitting PCE infected water and to dig and play in dirt and on ground surfaces overlaying the PCE plume, and to raise children in the plume area. The only caution expressed by the agencies were their warnings to citizens residing or working in the plume area not to use their private wells for drinking, cleaning, or bathing. *See* BN Ex. D–22, pp. 3–8.

This evidence demonstrates that no reasonable cause for concern exists that someone or something will be exposed to a risk of harm from the PCE contamination if the Court does not take action. The Court therefore concludes that while Plaintiffs' evidence is credible they have not shown clearly that Steiner is a significant contributor to the PCE plume or that the plume constitutes an imminent and substantial endangerment to health or the environment.

### Conclusion

Based on the foregoing, the Court **ORDERS** that Plaintiffs' Motion for Preliminary Injunction is **GRANTED IN PART AND DENIED IN PART.** Plaintiffs' Motion is **GRANTED IN PART AND DENIED IN PART** with respect to their RCRA claim against Defendant Amoco, and injunctive relief is ordered as described above. Plaintiffs' Motion is **DENIED** with respect to their Clean Water Act Claims against all Defendants, and is **DENIED** in all respects as to Defendant Burlington Northern Railroad Company and Defendant Steiner Corporation.